# RENO, ATTORNEY GENERAL *v.* BOSSIER PARISH SCHOOL BOARD ET AL.

No. 95–1455.   Argued December 9, 1996—Decided May 12, 1997*

---

*Together with No. 95–1508, *Price et al.* v. *Bossier Parish School Board et al.*, also on appeal from the same court.

472

*Assistant Attorney General Patrick* argued the cause for appellant in No. 95–1455. With him on the briefs were *Acting Solicitor General Dellinger, Deputy Solicitor General Bender, Cornelia T. L. Pillard, David K. Flynn,* and *Steven H. Rosenbaum. John W. Borkowski* argued the cause for appellants in No. 95–1508. With him on the briefs were *Walter A. Smith, Jr., Patricia A. Brannan, Barbara R. Arnwine, Thomas J. Henderson, Brenda Wright,* and *Samuel L. Walters.*

*Michael A. Carvin* argued the cause for appellee Bossier Parish School Board in both cases. With him on the brief were *David H. Thompson, James J. Thornton,* and *Michael P. McDonald.*†

---

†*Laughlin McDonald, Neil Bradley, Steven R. Shapiro, Elaine R. Jones, Norman J. Chachkin,* and *Jacqueline Berrien* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*Sharon L. Browne* and *Deborah J. La Fetra* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging affirmance.

JUSTICE O'CONNOR delivered the opinion of the Court.

Today we clarify the relationship between § 2 and § 5 of the Voting Rights Act of 1965, 79 Stat. 437, 439, as amended, 42 U. S. C. §§ 1973, 1973c. Specifically, we decide two questions: (i) whether preclearance must be denied under § 5 whenever a covered jurisdiction's new voting "standard, practice, or procedure" violates § 2; and (ii) whether evidence that a new "standard, practice, or procedure" has a dilutive impact is always irrelevant to the inquiry whether the covered jurisdiction acted with "the purpose . . . of denying or abridging the right to vote on account of race or color" under § 5. We answer both in the negative.

I

Appellee Bossier Parish School Board (Board) is a jurisdiction subject to the preclearance requirements of § 5 of the Voting Rights Act of 1965, 42 U. S. C. § 1973c, and must therefore obtain the approval of either the United States Attorney General or the United States District Court for the District of Columbia before implementing any changes to a voting "qualification, prerequisite, standard, practice, or procedure." The Board has 12 members who are elected from single-member districts by majority vote to serve 4-year terms. When the 1990 census revealed wide population disparities among its districts, see App. to Juris. Statement 93a (Stipulations of Fact and Law ¶ 82), the Board decided to redraw the districts to equalize the population distribution.

During this process, the Board considered two redistricting plans. It considered, and initially rejected, the redistricting plan that had been recently adopted by the Bossier Parish Police Jury, the parish's primary governing body (the Jury plan), to govern its own elections. Just months before, the Attorney General had precleared the Jury plan, which also contained 12 districts. *Id.*, at 88a (Stipulations ¶ 68). None of the 12 districts in the Board's existing plan or in the Jury plan contained a majority of black residents. *Id.*, at

93a (Stipulations ¶ 82) (under 1990 population statistics in the Board's existing districts, the three districts with highest black concentrations contain 46.63%, 43.79%, and 30.13% black residents, respectively); *id.*, at 85a (Stipulations ¶ 59) (population statistics for the Jury plan, with none of the plan's 12 districts containing a black majority). Because the Board's adoption of the Jury plan would have maintained the status quo regarding the number of black-majority districts, the parties stipulated that the Jury plan was not "retrogressive." *Id.*, at 141a (Stipulations ¶ 252) ("The . . . plan is not retrogressive to minority voting strength compared to the existing benchmark plan . . ."). Appellant George Price, president of the local chapter of the National Association for the Advancement of Colored People (NAACP), presented the Board with a second option—a plan that created two districts each containing not only a majority of black residents, but a majority of voting-age black residents. *Id.*, at 98a (Stipulations ¶ 98). Over vocal opposition from local residents, black and white alike, the Board voted to adopt the Jury plan as its own, reasoning that the Jury plan would almost certainly be precleared again and that the NAACP plan would require the Board to split 46 electoral precincts.

But the Board's hopes for rapid preclearance were dashed when the Attorney General interposed a formal objection to the Board's plan on the basis of "new information" not available when the Justice Department had precleared the plan for the Police Jury—namely, the NAACP's plan, which demonstrated that "black residents are sufficiently numerous and geographically compact so as to constitute a majority in two single-member districts." *Id.*, at 155a–156a (Attorney General's August 30, 1993, objection letter). The objection letter asserted that the Board's plan violated § 2 of the Act, 42 U. S. C. § 1973, because it "unnecessarily limit[ed] the opportunity for minority voters to elect their candidates of choice," App. to Juris. Statement, at 156a, as compared to the new alternative. Relying on 28 CFR § 51.55(b)(2) (1996), which

provides that the Attorney General shall withhold preclearance where "necessary to prevent a clear violation of amended Section 2 [42 U. S. C. § 1973]," the Attorney General concluded that the Board's redistricting plan warranted a denial of preclearance under § 5. App. to Juris. Statement 157a. The Attorney General declined to reconsider the decision. *Ibid.*

The Board then filed this action seeking preclearance under § 5 in the District Court for the District of Columbia. Appellant Price and others intervened as defendants. The three-judge panel granted the Board's request for preclearance, over the dissent of one judge. 907 F. Supp. 434, 437 (1995). The District Court squarely rejected the appellants' contention that a voting change's alleged failure to satisfy § 2 constituted an independent reason to deny preclearance under § 5: "We hold, as has every court that has considered the question, that a political subdivision that does not violate either the 'effect' or the 'purpose' prong of section 5 cannot be denied preclearance because of an alleged section 2 violation." *Id.*, at 440–441. Given this holding, the District Court quite properly expressed no opinion on whether the Jury plan in fact violated § 2, and its refusal to reach out and decide the issue in dicta does not require us, as JUSTICE STEVENS insists, to "assume that the record discloses a 'clear violation' of § 2." See *post*, at 499 (opinion dissenting in part and concurring in part). That issue has yet to be decided by any court. The District Court did, however, reject appellants' related argument that a court "must still consider evidence of a section 2 violation as evidence of discriminatory purpose under section 5." *Id.*, at 445. We noted probable jurisdiction on June 3, 1996. 517 U. S. 1232.

II

The Voting Rights Act of 1965 (Act), 42 U. S. C. § 1973 *et seq.*, was enacted by Congress in 1964 to "attac[k] the blight of voting discrimination" across the Nation. S. Rep. No. 97–

417, 2d Sess., p. 4 (1982); *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308 (1966). Two of the weapons in the Federal Government's formidable arsenal are §5 and §2 of the Act. Although we have consistently understood these sections to combat different evils and, accordingly, to impose very different duties upon the States, see *Holder* v. *Hall*, 512 U. S. 874, 883 (1994) (plurality opinion) (noting how the two sections "differ in structure, purpose, and application"), appellants nevertheless ask us to hold that a violation of §2 is an independent reason to deny preclearance under §5. Unlike JUSTICE STEVENS, *post*, at 502–503, and n. 5 (opinion dissenting in part and concurring in part), we entertain little doubt that the Department of Justice or other litigants would "routinely" attempt to avail themselves of this new reason for denying preclearance, so that recognizing §2 violations as a basis for denying §5 preclearance would inevitably make compliance with §5 contingent upon compliance with §2. Doing so would, for all intents and purposes, replace the standards for §5 with those for §2. Because this would contradict our longstanding interpretation of these two sections of the Act, we reject appellants' position.

Section 5, 42 U. S. C. §1973c, was enacted as

> "a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. . . . Congress therefore decided, as the Supreme Court held it could, 'to shift the advantage of time and inertia from the perpetrators of the evil to its victim,' by 'freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory.'" *Beer* v. *United States*, 425 U. S. 130, 140 (1976) (quoting H. R. Rep. No. 94–196, pp. 57–58 (1970)).

In light of this limited purpose, §5 applies only to certain States and their political subdivisions. Such a covered ju-

risdiction may not implement any change in a voting "quali-
fication, prerequisite, standard, practice, or procedure" un-
less it first obtains either administrative preclearance of that
change from the Attorney General or judicial preclearance
from the District Court for the District of Columbia. 42
U. S. C. § 1973c. To obtain judicial preclearance, the juris-
diction bears the burden of proving that the change "does
not have the purpose and will not have the effect of denying
or abridging the right to vote on account of race or color."
*Ibid.; City of Rome* v. *United States*, 446 U. S. 156, 183, n. 18
(1980) (covered jurisdiction bears burden of proof). Because
§ 5 focuses on "freez[ing] election procedures," a plan has an
impermissible "effect" under § 5 only if it "would lead to a
retrogression in the position of racial minorities with respect
to their effective exercise of the electoral franchise." *Beer*,
*supra*, at 141.

Retrogression, by definition, requires a comparison of a
jurisdiction's new voting plan with its existing plan. See
*Holder, supra*, at 883 (plurality opinion) ("Under § 5, then,
the proposed voting practice is measured against the exist-
ing voting practice to determine whether retrogression
would result from the proposed change"). It also necessar-
ily implies that the jurisdiction's existing plan is the bench-
mark against which the "effect" of voting changes is meas-
ured. In *Beer*, for example, we concluded that the city of
New Orleans' reapportionment of its council districts, which
created one district with a majority of voting-age blacks
where before there had been none, had no discriminatory
"effect." 425 U. S., at 141–142 ("It is thus apparent that a
legislative reapportionment that enhances the position of ra-
cial minorities with respect to their effective exercise of the
electoral franchise can hardly have the 'effect' of diluting or
abridging the right to vote on account of race within the
meaning of § 5"). Likewise, in *City of Lockhart* v. *United
States*, 460 U. S. 125 (1983), we found that the city's new char-
ter had no retrogressive "effect" even though it maintained

the city's prior practice of electing its council members at-large from numbered posts, and instituted a new practice of electing two of the city's four council members every year (instead of electing all the council members every two years). While each practice could "have a discriminatory effect under some circumstances," *id.*, at 135, the fact remained that "[s]ince the new plan did not *increase* the degree of discrimination against [the city's Mexican-American population], it was entitled to § 5 preclearance [because it was not retrogressive]," *id.*, at 134 (emphasis added).

Section 2, on the other hand, was designed as a means of eradicating voting practices that "minimize or cancel out the voting strength and political effectiveness of minority groups," S. Rep. No. 97–417, at 28. Under this broader mandate, § 2 bars *all* States and their political subdivisions from maintaining any voting "standard, practice, or procedure" that "results in a denial or abridgement of the right . . . to vote on account of race or color." 42 U. S. C. § 1973(a). A voting practice is impermissibly dilutive within the meaning of § 2

> "if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [members of a class defined by race or color] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b).

A plaintiff claiming vote dilution under § 2 must initially establish that: (i) "[the racial group] is sufficiently large and geographically compact to constitute a majority in a single-member district"; (ii) the group is "politically cohesive"; and (iii) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

*Thornburg* v. *Gingles,* 478 U. S. 30, 50–51 (1986); *Growe* v. *Emison,* 507 U. S. 25, 40 (1993). The plaintiff must also demonstrate that the totality of the circumstances supports a finding that the voting scheme is dilutive. *Johnson* v. *De Grandy,* 512 U. S. 997, 1011 (1994); see *Gingles, supra,* at 44–45 (listing factors to be considered by a court in assessing the totality of the circumstances). Because the very concept of vote dilution implies—and, indeed, necessitates—the existence of an "undiluted" practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark "undiluted" voting practice. *Holder* v. *Hall,* 512 U. S., at 881 (plurality opinion); *id.,* at 950–951 (Blackmun, J., dissenting).

Appellants contend that preclearance must be denied under § 5 whenever a covered jurisdiction's redistricting plan violates § 2. The upshot of this position is to shift the focus of § 5 from nonretrogression to vote dilution, and to change the § 5 benchmark from a jurisdiction's existing plan to a hypothetical, undiluted plan.

But § 5, we have held, is designed to combat only those effects that are retrogressive. See *supra,* at 477–479. To adopt appellants' position, we would have to call into question more than 20 years of precedent interpreting § 5. See, *e. g., Beer, supra; City of Lockhart, supra.* This we decline to do. Section 5 already imposes upon a covered jurisdiction the difficult burden of proving the *absence* of discriminatory purpose and effect. See, *e. g., Elkins* v. *United States,* 364 U. S. 206, 219 (1960) ("[A]s a practical matter it is never easy to prove a negative"). To require a jurisdiction to litigate whether its proposed redistricting plan also has a dilutive "result" before it can implement that plan—even if the Attorney General bears the burden of proving that "result"—is to increase further the serious federalism costs already implicated by § 5. See *Miller* v. *Johnson,* 515 U. S. 900, 926 (1995) (noting the "federalism costs exacted by § 5 preclearance").

Appellants nevertheless contend that we should adopt their reading of §5 because it is supported by our decision in *Beer*, by the Attorney General's regulations, and by considerations of public policy. In *Beer*, we held that §5 prohibited only retrogressive effects and further observed that "an ameliorative new legislative apportionment cannot violate §5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution." 425 U. S., at 141. Although there had been no allegation that the redistricting plan in *Beer* "so . . . discriminate[d] on the basis of race or color as to be unconstitutional," we cited in dicta a few cases to illustrate when a redistricting plan might be found to be constitutionally offensive. *Id.*, at 142, n. 14. Among them was our decision in *White* v. *Regester*, 412 U. S. 755 (1973), in which we sustained a vote dilution challenge, brought under the Equal Protection Clause, to the use of multimember election districts in two Texas counties. Appellants argue that "[b]ecause vote dilution standards under the Constitution and Section 2 were generally coextensive at the time *Beer* was decided, *Beer*'s discussion meant that practices that violated Section 2 would not be entitled to preclearance under Section 5." Brief for Federal Appellant 36–37.

Even assuming, *arguendo*, that appellants' argument had some support in 1976, it is no longer valid today because the applicable statutory and constitutional standards have changed. Since 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the State or political subdivision acted with a discriminatory purpose. See *Mobile* v. *Bolden*, 446 U. S. 55, 62 (1980) (plurality opinion) ("Our decisions . . . have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose"); *id.*, at 66 ("[O]nly if there is purposeful discrimination can there be a violation of the Equal Protection

Clause of the Fourteenth Amendment"); see also *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"). When Congress amended § 2 in 1982, it clearly expressed its desire that § 2 *not* have an intent component, see S. Rep. No. 97–417, at 2 ("Th[e 1982] amendment is designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2"). Because now the Constitution requires a showing of intent that § 2 does not, a violation of § 2 is no longer *a fortiori* a violation of the Constitution. Congress itself has acknowledged this fact. See *id.*, at 39 ("The Voting Rights Act is the best example of Congress' power to enact implementing legislation that goes beyond the direct prohibitions of the Constitution itself").

JUSTICE STEVENS argues that the subsequent divergence of constitutional and statutory standards is of no moment because, in his view, we "did not [in *Beer*] purport to distinguish between challenges brought under the Constitution and those brought under the [Voting Rights] statute." *Post*, at 504 (opinion dissenting in part and concurring in part). Our citation to *White*, he posits, incorporated *White*'s standard into our exception for nonretrogressive apportionments that violate § 5, whether or not that standard continued to coincide with the constitutional standard. In essence, JUSTICE STEVENS reads *Beer* as creating an exception for nonretrogressive apportionments that so discriminate on the basis of race or color as to violate any federal law that happens to coincide with what would have amounted to a constitutional violation in 1976. But this reading flatly contradicts the plain language of the exception we recognized, which applies solely to apportionments that "so discriminat[e] on the basis of race or color as to violate *the Constitution*." *Beer, supra*, at 141 (emphasis added). We cited *White*, not for itself, but because it embodied the current

*constitutional* standard for a violation of the Equal Protection Clause. See also 425 U. S., at 143, n. 14 (noting that New Orleans' plan did "not remotely approach a violation of the *constitutional* standards enunciated in" *White* and other cited cases (emphasis added)). When *White* ceased to represent the current understanding of the Constitution, a violation of its standard—even though that standard was later incorporated in §2—no longer constituted grounds for denial of preclearance under *Beer.*

Appellants' next claim is that we must defer to the Attorney General's regulations interpreting the Act, one of which states:

> "In those instances in which the Attorney General concludes that, as proposed, the submitted change is free of discriminatory purpose and retrogressive effect, but also concludes that a bar to implementation of the change is necessary to prevent a clear violation of amended Section 2, the Attorney General shall withhold Section 5 preclearance." 28 CFR §51.55(b)(2) (1996).

Although we normally accord the Attorney General's construction of the Act great deference, "we only do so if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable." *Presley* v. *Etowah County Comm'n,* 502 U. S. 491, 508 (1992). Given our longstanding interpretation of §5, see *supra,* at 477–479, 480–482 and this page, which Congress has declined to alter by amending the language of §5, *Arkansas Best Corp.* v. *Commissioner,* 485 U. S. 212, 222, n. 7 (1988) (placing some weight on Congress' failure to express disfavor with our 25-year interpretation of a tax statute), we believe Congress has made it sufficiently clear that a violation of §2 is not grounds in and of itself for denying preclearance under §5. That there may be some suggestion to the contrary in the Senate Report to the 1982 Voting Rights Act amendments, S. Rep. No. 97–417, *supra,* at 12, n. 31, does not

change our view. With those amendments, Congress, among other things, renewed §5 but did so without changing its applicable standard. We doubt that Congress would depart from the settled interpretation of §5 and impose a demonstrably greater burden on the jurisdictions covered by §5, see *supra*, at 480, by dropping a footnote in a Senate Report instead of amending the statute itself. See *Pierce* v. *Underwood*, 487 U. S. 552, 567 (1988) ("Quite obviously, reenacting precisely the same language would be a strange way to make a change"). See also *City of Lockhart* v. *United States*, 460 U. S. 125 (1983) (reaching its holding over Justice Marshall's dissent, which raised the argument now advanced by appellants regarding this passage in the Senate Report).

Nor does the portion of the House Report cited by JUSTICE STEVENS unambiguously call for the incorporation of §2 into §5. That portion of the Report states:

> "[M]any voting and election practices currently in effect are outside the scope of [§5] . . . because they were in existence before 1965. . . . Under the Voting Rights Act, whether a discriminatory practice or procedure is of recent origin affects only the mechanism that triggers relief, i. e., litigation [under §2] or preclearance [under §5]." H. R. Rep. No. 97–227, p. 28 (1981).

The obvious thrust of this passage is to establish that pre-1965 discriminatory practices are not free from scrutiny under the Act just because they need not be precleared under §5: Such practices might still violate §2. But to say that pre-1965 practices can be reached solely by §2 is not to say that all post-1965 changes that might violate §2 may be reached by both §2 *and §5* or that "the substantive standards for §2 and §5 [are] the same," see *post*, at 506 (opinion dissenting in part and concurring in part). Our ultimate conclusion is also not undercut by statements found in the "post-enactment legislative record," see *post*, at 506, n. 9, given that "the views of a subsequent Congress form a hazardous

basis for inferring the intent of an earlier one." *United States* v. *Price*, 361 U. S. 304, 313 (1960). We therefore decline to give these sources controlling weight.

Appellants' final appeal is to notions of public policy. They assert that if the district court or Attorney General examined whether a covered jurisdiction's redistricting plan violates § 2 at the same time as ruling on preclearance under § 5, there would be no need for two separate actions and judicial resources would be conserved. Appellants are undoubtedly correct that adopting their interpretation of § 5 would serve judicial economy in those cases where a § 2 challenge follows a § 5 proceeding. But this does not always happen, and the burden on judicial resources might actually increase if appellants' position prevailed because § 2 litigation would effectively be incorporated into *every* § 5 proceeding.

Appellants lastly argue that preclearance is an equitable remedy, obtained through a declaratory judgment action in district court, see 42 U. S. C. § 1973c, or through the exercise of the Attorney General's discretion, see 28 CFR § 51.52(a) (1996). A finding that a redistricting plan violates § 2 of the Act, they contend, is an equitable "defense," on the basis of which a decisionmaker should, in the exercise of its equitable discretion, be free to deny preclearance. This argument, however, is an attempt to obtain through equity that which the law—*i. e.*, the settled interpretation of § 5—forbids. Because "it is well established that '[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law,'" *INS* v. *Pangilinan*, 486 U. S. 875, 883 (1988) (citing *Hedges* v. *Dixon County*, 150 U. S. 182, 192 (1893)), this argument must fail.

Of course, the Attorney General or a private plaintiff remains free to initiate a § 2 proceeding if either believes that a jurisdiction's newly enacted voting "qualification, prerequisite, standard, practice, or procedure" may violate that section. All we hold today is that preclearance under § 5 may not be denied on that basis alone.

## III

Appellants next contend that evidence showing that a jurisdiction's redistricting plan dilutes the voting power of minorities is at least *relevant* in a § 5 proceeding because it tends to prove that the jurisdiction enacted its plan with a discriminatory "purpose." The District Court, reasoning that "[t]he line [between § 2 and § 5] cannot be blurred by allowing a defendant to do indirectly what it cannot do directly," 907 F. Supp., at 445, rejected this argument and held that it "will not permit section 2 evidence to prove discriminatory purpose under section 5," *ibid.* Because we hold that some of this "§ 2 evidence" may be relevant to establish a jurisdiction's "intent to retrogress" and cannot say with confidence that the District Court considered the evidence proffered to show that the Board's reapportionment plan was dilutive, we vacate this aspect of the District Court's holding and remand. In light of this conclusion, we leave open for another day the question whether the § 5 purpose inquiry ever extends beyond the search for retrogressive intent. See *Kentucky Dept. of Corrections* v. *Thompson,* 490 U. S. 454, 465, n. 5 (1989) (declining to decide an issue that "is not necessary to our decision"). Reserving this question is particularly appropriate when, as in this suit, it was not squarely addressed by the decision below or in the parties' briefs on appeal. See Brief for Federal Appellant 23; Brief for Appellant Price et al. 31–33, 34–35; Brief for Appellee 42–43. But in doing so, we do not, contrary to JUSTICE STEVENS' view, see *post,* at 499 (opinion dissenting in part and concurring in part), necessarily assume that the Board enacted the Jury plan with some nonretrogressive, but nevertheless discriminatory, "purpose." The existence of such a purpose, and its relevance to § 5, are issues to be decided on remand.

Although § 5 warrants a denial of preclearance if a covered jurisdiction's voting change "ha[s] the purpose [or] . . . the effect of denying or abridging the right to vote on account

of race or color," 42 U. S. C. § 1973c, we have consistently interpreted this language in light of the purpose underlying § 5—"to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities." *Beer*, 425 U. S., at 141. Accordingly, we have adhered to the view that the only "effect" that violates § 5 is a retrogressive one. *Ibid.; City of Lockhart*, 460 U. S., at 134.

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. Rule Evid. 401. As we observed in *Arlington Heights*, 429 U. S., at 266, the impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions. Thus, a jurisdiction that enacts a plan having a dilutive impact is more likely to have acted with a discriminatory intent to dilute minority voting strength than a jurisdiction whose plan has no such impact. A jurisdiction that acts with an intent to dilute minority voting strength is more likely to act with an intent to worsen the position of minority voters—*i. e.*, an intent to retrogress—than a jurisdiction acting with no intent to dilute. The fact that a plan has a dilutive impact therefore makes it "more probable" that the jurisdiction adopting that plan acted with an intent to retrogress than "it would be without the evidence." To be sure, the link between dilutive impact and intent to retrogress is far from direct, but "the basic standard of relevance . . . is a liberal one," *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579, 587 (1993), and one we think is met here.

That evidence of a plan's dilutive impact may be relevant to the § 5 purpose inquiry does not, of course, mean that such evidence is dispositive of that inquiry. In fact, we have previously observed that a jurisdiction's single decision to choose a redistricting plan that has a dilutive impact does not, with-

out more, suffice to establish that the jurisdiction acted with a discriminatory purpose. *Shaw* v. *Hunt*, 517 U. S. 899, 914, n. 6 (1996) ("[W]e doubt that a showing of discriminatory effect under § 2, alone, could support a claim of discriminatory purpose under § 5"). This is true whether the jurisdiction chose the more dilutive plan because it better comported with its traditional districting principles, see *Miller* v. *Johnson*, 515 U. S., at 922 (rejecting argument that a jurisdiction's failure to adopt the plan with the greatest possible number of majority black districts establishes that it acted with a discriminatory purpose); *Shaw, supra*, at 912–913 (same), or if it chose the plan for no reason at all. Indeed, if a plan's dilutive impact were dispositive, we would effectively incorporate § 2 into § 5, which is a result we find unsatisfactory no matter how it is packaged. See Part II, *supra*.

As our discussion illustrates, assessing a jurisdiction's motivation in enacting voting changes is a complex task requiring a "sensitive inquiry into such circumstantial and direct evidence as may be available." *Arlington Heights*, 429 U. S., at 266. In conducting this inquiry, courts should look to our decision in *Arlington Heights* for guidance. There, we set forth a framework for analyzing "whether invidious discriminatory purpose was a motivating factor" in a government body's decisionmaking. *Ibid.* In addition to serving as the framework for examining discriminatory purpose in cases brought under the Equal Protection Clause for over two decades, see, *e. g., Shaw* v. *Reno*, 509 U. S. 630, 644 (1993) (citing *Arlington Heights* standard in context of Equal Protection Clause challenge to racial gerrymander of districts); *Rogers* v. *Lodge*, 458 U. S. 613, 618 (1982) (evaluating vote dilution claim under Equal Protection Clause using *Arlington Heights* test); *Mobile*, 446 U. S., at 70–74 (same), the *Arlington Heights* framework has also been used, at least in part, to evaluate purpose in our previous § 5 cases. See *Pleasant Grove* v. *United States*, 479 U. S. 462, 469–470 (1987) (considering city's history in rejecting annexation of

black neighborhood and its departure from normal procedures when calculating costs of annexation alternatives); see also *Busbee* v. *Smith,* 549 F. Supp. 494, 516–517 (DC 1982), summarily aff'd, 459 U. S. 1166 (1983) (referring to *Arlington Heights* test); *Port Arthur* v. *United States,* 517 F. Supp. 987, 1019, aff'd, 459 U. S. 159 (1982) (same).

The "important starting point" for assessing discriminatory intent under *Arlington Heights* is "the impact of the official action whether it 'bears more heavily on one race than another.'" 429 U. S., at 266 (citing *Washington* v. *Davis,* 426 U. S. 229, 242 (1976)). In a §5 case, "impact" might include a plan's retrogressive effect and, for the reasons discussed above, its dilutive impact. Other considerations relevant to the purpose inquiry include, among other things, "the historical background of the [jurisdiction's] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence"; and "[t]he legislative or administrative history, especially . . . [any] contemporary statements by members of the decisionmaking body." 429 U. S., at 266–268.

We are unable to determine from the District Court's opinion in this action whether it deemed irrelevant all evidence of the dilutive impact of the redistricting plan adopted by the Board. At one point, the District Court correctly stated that "the adoption of one nonretrogressive plan rather than another nonretrogressive plan that contains more majority-black districts cannot *by itself* give rise to the inference of discriminatory intent." 907 F. Supp., at 450 (emphasis added). This passage implies that the District Court believed that the existence of less dilutive options was at least relevant to, though not dispositive of, its purpose inquiry. While this language is consistent with our holding today, see *supra,* at 486–488, the District Court also declared that "we will not permit section 2 evidence to prove discriminatory purpose under section 5," *supra,* at 486. With this statement, the District Court appears to endorse the notion that evidence

of dilutive impact is irrelevant even to an inquiry into retrogressive intent, a notion we reject. See *supra*, at 486–488.

The Board contends that the District Court actually "presumed that white majority districts had [a dilutive] effect," Brief for Appellee 35, and "cut directly to the dispositive question 'started' by the existence of [a dilutive] impact: did the Board have 'legitimate, nondiscriminatory motives' for adopting its plan[?]" *Id.*, at 33. Even if the Board were correct, the District Court gave no indication that it was assuming the plan's dilutive effect, and we hesitate to attribute to the District Court a rationale it might not have employed. Because we are not satisfied that the District Court considered evidence of the dilutive impact of the Board's redistricting plan, we vacate this aspect of the District Court's opinion. The District Court will have the opportunity to apply the *Arlington Heights* test on remand as well as to address appellants' additional arguments that it erred in refusing to consider evidence that the Board was in violation of an ongoing injunction "to 'remedy any remaining vestiges of [a] dual [school] system,'" 907 F. Supp., at 449, n. 18.

\* \* \*

The judgment of the District Court is vacated, and the case is remanded for further proceedings consistent with this decision.

*It is so ordered.*

JUSTICE THOMAS, concurring.

Although I continue to adhere to the views I expressed in *Holder* v. *Hall*, 512 U. S. 874, 891 (1994) (opinion concurring in judgment), I join today's opinion because it is consistent with our vote dilution precedents. I fully anticipate, however, that as a result of today's holding, all of the problems we have experienced in § 2 vote dilution cases will now be replicated and, indeed, exacerbated in the § 5 retrogression inquiry.

I have trouble, for example, imagining a reapportionment change that could not be deemed "retrogressive" under our

vote dilution jurisprudence by a court inclined to find it so. We have held that a reapportionment plan that "enhances the position of racial minorities" by increasing the number of majority-minority districts does not "have the 'effect' of diluting or abridging the right to vote on account of race within the meaning of § 5." *Beer* v. *United States*, 425 U. S. 130, 141 (1976). But in so holding we studiously avoided addressing one of the necessary consequences of increasing majority-minority districts: Such action *necessarily decreases* the level of minority influence in surrounding districts, and to that extent "dilutes" the vote of minority voters in those other districts, and perhaps dilutes the influence of the minority group as a whole. See, *e. g., Hays* v. *Louisiana*, 936 F. Supp. 360, 364, n. 17 (WD La. 1996) (three-judge court) (noting that plaintiffs' expert "argues convincingly that our plan, with its one black majority and three influence districts, empowers more black voters statewide than does" a plan with two black-majority districts and five "bleached" districts in which minority influence was reduced in order to create the second black-majority district); cf. *Johnson* v. *De Grandy*, 512 U. S. 997, 1007 (1994) (noting that dilution can occur by "fragmenting the minority voters among several districts . . . or by packing them into one or a small number of districts to minimize their influence in the districts next door").

Under our vote dilution jurisprudence, therefore, a court could strike down *any* reapportionment plan, either because it did not include enough majority-minority districts or because it did (and thereby diluted the minority vote in the remaining districts). A court could presumably even strike down a new reapportionment plan that did not significantly alter the status quo at all, on the theory that such a plan did not measure up to some hypothetical ideal. With such an indeterminate "rule," § 5 ceases to be primarily a prophylactic tool in the important war against discrimination in voting, and instead becomes the means whereby the Federal Government, and particularly the Department of Justice, usurps

the legitimate political judgments of the States. And such an empty "rule" inevitably forces the courts to make political judgments regarding which type of apportionment best serves supposed minority interests—judgments that the courts are ill equipped to make.

I can at least find some solace in the belief that today's opinion will force us to confront, with a renewed sense of urgency, this fundamental inconsistency that lies at the heart of our vote dilution jurisprudence.

Beyond my general objection to our vote dilution precedent, the one portion of the majority opinion with which I disagree is the majority's new suggestion that preclearance standards established by the Department of Justice are "normally" entitled to deference. See *ante*, at 483.\* Section 5 sets up alternative routes for preclearance, and the primary route specified is through the District Court for the District of Columbia, not through the Attorney General's office. See 42 U. S. C. § 1973c (generally requiring District Court preclearance, with a proviso that covered jurisdictions may *obtain* preclearance by the Attorney General in lieu of District Court preclearance, but providing no authority for the Attorney General to *preclude* judicial preclearance). Requiring the District Court to defer to adverse preclearance decisions by the Attorney General based upon the very preclearance standards she articulates would essentially render the independence of the District Court preclearance route a nullity.

Moreover, given our own "longstanding interpretation of § 5," see *ante*, at 483, deference to the particular preclearance regulation addressed in this action would be inconsistent with another of the Attorney General's regulations, which provides: "In making determinations [under § 5] the Attorney General will be guided by the relevant decisions of the

---

\*I do not address the separate question, not presented by this action, whether the Department's *interpretation* of the Voting Rights Act of 1965, as opposed to its articulation of standards applicable to its own preclearance determinations, is entitled to deference. The regulation at issue here only purports to be the latter.

Supreme Court of the United States and of other Federal courts." 28 CFR § 51.56 (1996). Thus, while I agree with the majority's decision not to defer to the Attorney General's standards, I would reach that result on different grounds.

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, concurring in part and concurring in the judgment.

I join Parts I and II of the majority opinion, and Part III insofar as it is not inconsistent with this opinion. I write separately to express my disagreement with one aspect of the majority opinion. The majority says that we need not decide "whether the § 5 purpose inquiry ever extends beyond the search for retrogressive intent." *Ante*, at 486. In my view, we should decide the question, for otherwise the District Court will find it difficult to evaluate the evidence that we say it must consider. Cf. *post*, at 508 (STEVENS, J., dissenting in part and concurring in part). Moreover, the answer to the question is that the "purpose" inquiry does extend beyond the search for retrogressive intent. It includes the purpose of unconstitutionally diluting minority voting strength.

The language of § 5 itself forbids a change in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," where that change either (1) has the "purpose" or (2) will have the "effect" of "denying or abridging the right to vote on account of race or color." 42 U. S. C. § 1973c. These last few words reiterate in context the language of the Fifteenth Amendment itself: "The right of citizens . . . to vote shall not be denied or abridged . . . on account of race [or] color . . . ." This use of constitutional language indicates that one purpose forbidden by the statute is a purpose to act unconstitutionally. And a new plan enacted with the purpose of unconstitutionally diluting minority votes is an unconstitutional plan. *Mobile* v. *Bolden*, 446 U. S. 55, 62–63, 66 (1980) (plurality opinion); *ante*, at 481–482.

Of course, the constitutional language also applies to § 5's prohibition that rests upon "effects." The Court assumes, in its discussion of "effects," that the § 5 word "effects" does not now embody a *purely* constitutional test, whether or not it ever did so. See *ante*, at 478; *City of Rome* v. *United States*, 446 U. S. 156, 173, 177 (1980). And that fact, here, is beside the point. The separate argument about the meaning of the word "effect" concerns *how far beyond* the Constitution's requirements Congress intended that word to reach. The argument about "purpose" is simply whether Congress intended the word to reach *as far as* the Constitution itself, embodying those purposes that, in relevant context, the Constitution itself would forbid. I can find nothing in the Court's discussion that shows that Congress intended to restrict the meaning of the statutory word "purpose" short of what the Constitution itself requires. And the Court has previously expressly indicated that minority vote dilution is a harm that § 5 guards against. *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 569 (1969).

Consider a hypothetical example that will clarify the precise legal question here at issue. Suppose that a covered jurisdiction is choosing between two new voting plans, A and B. Neither plan is retrogressive. Plan A violates every traditional districting principle, but from the perspective of minority representation, it maintains the status quo, thereby meeting the "effects" test of § 5. See *ante*, at 478–479. Plan B is basically consistent with traditional districting principles and it also creates one or two new majority-minority districts (in a State where the number of such districts is significantly less than proportional to minority voting age population). Suppose further that the covered jurisdiction adopts Plan A. Without any other proposed evidence or justification, ordinary principles of logic and human experience suggest that the jurisdiction would likely have adopted Plan A with "the purpose . . . of denying or abridging the right to vote on account of race or color." § 1973c. It is reason-

able to assume that the Constitution would forbid the use of such a plan. See *Rogers* v. *Lodge*, 458 U. S. 613, 617 (1982) (Fourteenth Amendment covers vote dilution claims); *Mobile*, 446 U. S., at 66 (plurality opinion) (same). And compare *id.*, at 62–63 (intentional vote dilution may be illegal under the Fifteenth Amendment) and *Gomillion* v. *Lightfoot*, 364 U. S. 339, 346 (1960) (Fifteenth Amendment covers municipal boundaries drawn to exclude blacks), with *Mobile, supra,* at 84, n. 3 (STEVENS, J., concurring in judgment) (*Mobile* plurality said that Fifteenth Amendment does not reach vote dilution); *Voinovich* v. *Quilter*, 507 U. S. 146, 159 (1993) ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims . . ."); *Shaw* v. *Reno*, 509 U. S. 630, 645 (1993) (endorsing the *Gomillion* concurrence's Fourteenth Amendment approach); and *Beer* v. *United States*, 425 U. S. 130, 142, n. 14 (1976). Then, to read § 5's "purpose" language to require approval of Plan A, even though the jurisdiction cannot provide a neutral explanation for its choice, would be both to read § 5 contrary to its plain language and also to believe that Congress would have wanted a § 5 court (or the Attorney General) to approve an unconstitutional plan adopted with an unconstitutional purpose.

In light of this example, it is not surprising that this Court has previously indicated that the purpose part of § 5 prohibits a plan adopted with the purpose of unconstitutionally diluting minority voting strength, whether or not the plan is retrogressive in its effect. In *Shaw* v. *Hunt*, 517 U. S. 899 (1996), for example, the Court doubted "that a showing of discriminatory effect under § 2, *alone*, could support a claim of discriminatory purpose under § 5." *Id.*, at 914, n. 6 (emphasis added). The word "alone" suggests that the evidence of a discriminatory effect there at issue—evidence of dilution—could be relevant to a discriminatory purpose claim. And if so, the more natural understanding of § 5 is that an unlawful purpose includes more than simply a purpose to

retrogress. Otherwise, dilution would either dispositively show an unlawful discriminatory effect (if retrogressive) or it would almost always be irrelevant (if not retrogressive). Either way, it would not normally have much to do with unlawful purpose. See also the discussions in *Richmond* v. *United States,* 422 U. S. 358, 378–379 (1975) (annexation plan did not have an impermissible dilutive effect but the Court remanded for a determination of whether there was an impermissible § 5 purpose); *Pleasant Grove* v. *United States,* 479 U. S. 462, 471–472, and n. 11 (1987) (purpose to minimize *future* black voting strength is impermissible under § 5); *Port Arthur* v. *United States,* 459 U. S. 159, 168 (1982) (a plan adopted for a discriminatory purpose is invalid under § 5 even if it "might otherwise be said to reflect the political strength of the minority community"); *post,* at 507–508 (STEVENS, J., dissenting in part and concurring in part).

*Miller* v. *Johnson,* 515 U. S. 900 (1995), also implicitly assumed that § 5's "purpose" stretched beyond the purely retrogressive. There, the Justice Department pointed out that Georgia made a choice between two redistricting plans, one of which (call it Plan A) had more majority-black districts than the other (call it Plan B). The Department argued that the fact that Georgia chose Plan B showed a forbidden § 5 discriminatory purpose. The Court rejected this argument, but the reason that the majority gave for that rejection is important. The Court pointed out that Plan B embodied traditional state districting principles. It reasoned that "[t]he State's policy of adhering to other districting principles instead of creating as many majority-minority districts as possible does not support an inference" of an unlawful discriminatory purpose. *Id.,* at 924. If the only relevant "purpose" were a retrogressive purpose, this reasoning, with its reliance upon traditional districting principles, would have been beside the point. The Court would have concerned itself only with Georgia's intent to worsen the position of minorities, not with the reasons why Georgia could

have adopted one of two potentially ameliorative plans. Indeed, the Court indicated that an ameliorative plan *would* run afoul of the § 5 purpose test if it violated the Constitution. *Ibid.* See also *Shaw* v. *Hunt, supra,* at 912–913.

In sum, the Court today should make explicit an assumption implicit in its prior cases. Section 5 prohibits a covered State from making changes in its voting practices and procedures where those changes have the *unconstitutional* "purpose" of unconstitutionally diluting minority voting strength.

JUSTICE STEVENS, with whom JUSTICE SOUTER joins, dissenting in part and concurring in part.

In my view, a plan that clearly violates § 2 is not entitled to preclearance under § 5 of the Voting Rights Act of 1965. The majority's contrary view would allow the Attorney General of the United States to place her stamp of approval on a state action that is in clear violation of federal law. It would be astonishing if Congress had commanded her to do so. In fact, however, Congress issued no such command. Surely no such command can be found in the text of § 5 of the Voting Rights Act.[1] Moreover, a fair review of the text

---

[1] As originally enacted, § 5 provided:

"Sec. 5. Whenever a State or political subdivision with respect to which the prohibitions set forth in section 4(a) are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney Gen-

and the legislative history of the 1982 amendment to §2 of that Act indicates that Congress intended the Attorney General to deny preclearance under §5 whenever it was clear that a new voting practice was prohibited by §2. This does not mean that she must make an independent inquiry into possible violations of §2 whenever a request for preclearance is made. It simply means that, as her regulations provide, she must refuse preclearance when "necessary to prevent a clear violation of amended section 2." 28 CFR §51.55(b)(2) (1996).

It is, of course, well settled that the Attorney General must refuse to preclear a new election procedure in a covered jurisdiction if it will "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U. S. 130, 141 (1976). A retrogressive effect or a retrogressive purpose is a sufficient basis for denying a preclearance request under §5. Today, however, the Court holds that retrogression is the only kind of effect that will justify denial of preclearance under §5, *ante*, at 476–485, and it assumes that "the §5 purpose inquiry [never] extends beyond the search for retrogressive intent." *Ante*, at 486. While I agree that this action must be remanded even under the Court's miserly interpretation of §5, I disagree with the Court's holding/assumption that §5 is concerned only with retrogressive effects and purposes.

Before explaining my disagreement with the Court, I think it important to emphasize the three factual predicates that underlie our analysis of the issues. First, we assume

---

eral and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code [28 U. S. C. §2284] and any appeal shall lie to the Supreme Court." 79 Stat. 439.

that the plan submitted by the Bossier Parish School Board (Board) was not "retrogressive" because it did not make matters any worse than they had been in the past. None of the 12 districts had ever had a black majority and a black person had never been elected to the Board. App. to Juris. Statement 67a. Second, because the majority in both the District Court and this Court found that even clear violations of § 2 must be precleared and thus found it unnecessary to discuss whether § 2 was violated in this action, we may assume that the record discloses a "clear violation" of § 2. This means that, in the language of § 2, it is perfectly clear that "the political processes leading to nomination or election [to positions on the Board] are not equally open to participation by members of [the African-American race] in that its members have less opportunity than other members of the electorate to . . . elect representatives of their choice." 42 U. S. C. § 1973(b).[2] Third, if the Court is correct in assuming that the purpose inquiry under § 5 may be limited to evidence of "retrogressive intent," it must also be willing to assume that the documents submitted in support of the request for preclearance clearly establish that the plan was adopted for the specific purpose of preventing African-Americans from obtaining representation on the Board. Indeed, for the purpose of analyzing the legal issues, we must assume that Judge Kessler, concurring in part and dissenting in part, accurately summarized the evidence when she wrote:

> "The evidence in this case demonstrates overwhelmingly that the School Board's decision to adopt the Police Jury redistricting plan was motivated by discriminatory

---

[2] Although the majority in the District Court refused to consider any of the evidence relevant to a § 2 violation, the parties' stipulations suggest that the plan violated § 2. For instance, the parties' stipulated that there had been a long history of discrimination against black voters in Bossier Parish, see App. to Juris. Statement 130a–140a; that voting in Bossier Parish was racially polarized, see *id.*, at 122a–127a; and that it was possible to draw two majority-black districts without violating traditional districting principles, see *id.*, at 76a, 82a–83a, 114a–115a.

purpose. The adoption of the Police Jury plan bears heavily on the black community because it denies its members a reasonable opportunity to elect a candidate of their choice. The history of discrimination by the Bossier School System and the Parish itself demonstrates the Board's continued refusal to address the concerns of the black community in Bossier Parish. The sequence of events leading up to the adoption of the plan illustrate the Board's discriminatory purpose. The School Board's substantive departures from traditional districting principles is similarly probative of discriminatory motive. Three School Board members have acknowledged that the Board is hostile to black representation. Moreover, some of the purported rationales for the School Board's decision are flat-out untrue, and others are so glaringly inconsistent with the facts of the case that they are obviously pretexts." 907 F. Supp. 434, 463 (DC 1995).

If the purpose and the effect of the Board's plan were simply to maintain the discriminatory status quo as described by Judge Kessler, the plan would not have been retrogressive. But, as I discuss below, that is not a sufficient reason for concluding that it complied with § 5.

I

In the Voting Rights Act of 1965, Congress enacted a complex scheme of remedies for racial discrimination in voting. As originally enacted, § 2 of the Act was "an uncontroversial provision" that "simply restated" the prohibitions against such discrimination "already contained in the Fifteenth Amendment," *Mobile* v. *Bolden,* 446 U. S. 55, 61 (1980) (plurality opinion). Like the constitutional prohibitions against discriminatory districting practices that were invalidated in cases like *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960), and *White* v. *Regester,* 412 U. S. 755 (1973), § 2 was made applicable to every State and political subdivision in the country.

Section 5, on the other hand, was highly controversial because it imposed novel, extraordinary remedies in certain areas where discrimination had been most flagrant. See *South Carolina* v. *Katzenbach*, 383 U. S. 301, 334–335 (1966).[3] Jurisdictions like Bossier Parish in Louisiana are covered by § 5 because their history of discrimination against African-Americans was a matter of special concern to Congress. Because these jurisdictions had resorted to various strategies to avoid complying with court orders to remedy discrimination, "Congress had reason to suppose that [they] might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself." *Id.*, at 335. Thus Congress enacted § 5, not to maintain the discriminatory status quo, but to stay ahead of efforts by the most resistant jurisdictions to undermine the Act's purpose of "rid[ding] the country of racial discrimination." *Id.*, at 315 ("The heart of the Act is a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant").

In areas of the country lacking a history of pervasive discrimination, Congress presumed that voting practices were generally lawful. Accordingly, the burden of proving a violation of § 2 has always rested on the party challenging the voting practice. The situation is dramatically different in covered jurisdictions. In those jurisdictions, § 5 flatly prohibits the adoption of any new voting procedure unless the State or political subdivision institutes an action in the Federal District Court for the District of Columbia and obtains a declaratory judgment that the change will not have a discriminatory purpose or effect. See 42 U. S. C. § 1973c. The burden of proving compliance with the Act rests on the jurisdiction. A proviso to § 5 gives the Attorney General the authority to allow the new procedure to go into effect, but

---

[3] Section 4 of the Act sets forth the formula for identifying the jurisdictions in which such discrimination had occurred, see *South Carolina* v. *Katzenbach*, 383 U. S., at 317–318.

like the immigration statutes that give her broad discretion to waive deportation of undesirable aliens, it does not expressly impose any limit on her discretion to refuse preclearance. See *ibid.* The Attorney General's discretion is, however, cabined by regulations that are presumptively valid if they "are reasonable and do not conflict with the Voting Rights Act itself," *Georgia* v. *United States*, 411 U. S. 526, 536 (1973). Those regulations provide that preclearance will generally be granted if a proposed change "is free of discriminatory purpose and retrogressive effect"; they also provide, however, that in "those instances" in which the Attorney General concludes "that a bar to implementation of the change is necessary to prevent a clear violation of amended section 2," preclearance shall be withheld.[4] There is no basis for the Court's speculation that litigants would so "'routinely,'" *ante*, at 477, employ this 10-year-old regulation as to "make compliance with §5 contingent upon compliance with §2," *ibid.* Nor do the regulations require the jurisdiction to assume the burden of proving the absence of vote

----

[4] Title 28 CFR §51.55 (1996) provides:

"Consistency with constitutional and statutory requirements.

"(a) *Consideration in general.* In making a determination the Attorney General will consider whether the change is free of discriminatory purpose and retrogressive effect in light of, and with particular attention being given to, the requirements of the 14th, 15th, and 24th amendments to the Constitution, 42 U. S. C. 1971(a) and (b), sections 2, 4(a), 4(f)(2), 4(f)(4), 201, 203(c), and 208 of the Act, and other constitutional and statutory provisions designed to safeguard the right to vote from denial or abridgment on account of race, color, or membership in a language minority group.

"(b) *Section 2.* (1) Preclearance under section 5 of a voting change will not preclude any legal action under section 2 by the Attorney General if implementation of the change subsequently demonstrates that such action is appropriate.

"(2) In those instances in which the Attorney General concludes that, as proposed, the submitted change is free of discriminatory purpose and retrogressive effect, but also concludes that a bar to implementation of the change is necessary to prevent a clear violation of amended section 2, the Attorney General shall withhold section 5 preclearance."

dilution, see *ante*, at 480. They merely preclude preclearance when "necessary to prevent a clear violation of . . . section 2." While the burden of disproving discriminatory purpose or retrogressive effect is on the submitting jurisdiction, if the Attorney General's conclusion that the change would clearly violate §2 is challenged, the burden on that issue, as in any §2 challenge, should rest on the Attorney General.[5]

The Court does not suggest that this regulation is inconsistent with the text of §5. Nor would this be persuasive, since the language of §5 forbids preclearance of any voting practice that would have "the purpose [or] effect of denying or abridging the right to vote on account of race or color." 42 U. S. C. §1973c. Instead the Court rests its entire analysis on the flawed premise that our cases hold that a change, even if otherwise unlawful, cannot have an effect prohibited by §5 unless that effect is retrogressive. The two cases on which the Court relies, *Beer* v. *United States*, 425 U. S. 130 (1976), and *City of Lockhart* v. *United States*, 460 U. S. 125 (1983), do hold (as the current regulations provide) that proof that a change is not retrogressive is normally sufficient to justify preclearance under §5. In neither case, however, was the Court confronted with the question whether that showing would be sufficient if the proposed change was so discriminatory that it clearly violated some other federal law.

---

[5] Thus, I agree with those courts that have found that the jurisdiction is not required to prove that its proposed change will not violate §2 in order to receive preclearance. See *Arizona* v. *Reno*, 887 F. Supp. 318, 321 (DC 1995). Although several three-judge District Courts have concluded that §2 standards should not be incorporated into §5, none has held that preclearance should be granted when there is a clear violation of §2; rather, they appear simply to have determined that a §2 inquiry is not routinely required in a §5 case. See, *e. g.*, *Georgia* v. *Reno*, 881 F. Supp. 7, 12–14 (DC 1994); *New York* v. *United States*, 874 F. Supp. 394, 398–399 (DC 1994); cf. *Burton* v. *Sheheen*, 793 F. Supp. 1329, 1350 (SC 1992) (holding that although courts are not "obligated to completely graft" §2 standards onto §5, "[i]t would be incongruous for the court to adopt a plan which did not comport with the standards and guidelines of §2").

In fact, in *Beer*—which held that a legislative reapportionment enhancing the position of African-American voters did not have a discriminatory effect—the Court stated that "an ameliorative new legislative apportionment cannot violate §5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution." 425 U. S., at 141.[6] Thus, to the extent that the *Beer* Court addressed the question at all, it suggested that certain nonretrogressive changes that were nevertheless discriminatory should not be precleared.

The Court discounts the significance of the "unless" clause because it refers to a constitutional violation rather than a statutory violation. According to the Court's reading, the *Beer* dictum at most precludes preclearance of changes that violate the Constitution rather than changes that violate §2. This argument is unpersuasive. As the majority notes, the *Beer* Court cites *White* v. *Regester*, 412 U. S., at 766, which found unconstitutional a reapportionment scheme that gave African-American residents "less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." Because, in 1976, when *Beer* was decided, the §2 standard was coextensive with the constitutional standard, *Beer* did not purport to distinguish between challenges brought under the Constitution and those brought under the statute. Rather *Beer*'s dictum suggests that any changes that violate the standard established in *White* v. *Regester* should not be precleared.[7]

---

[6] In *Lockhart* the Court disavowed reliance on the ameliorative character of the change reviewed in *Beer*, see 460 U. S., at 134, n. 10. It left open the question whether Congress had altered the *Beer* standard when it amended §2 in 1982, 460 U. S., at 133, n. 9, and said nothing about the possible significance of a violation of a constitutional or statutory prohibition against vote dilution.

[7] In response to this dissent, the majority contends that, at most, *Beer* v. *United States*, 425 U. S. 130 (1976), allows denial of preclearance for those changes that violate the Constitution. See *ante*, at 482–483. Thus, the majority apparently concedes that our "settled interpretation," *ante*,

As the Court recognizes, *ante*, at 481–482, the law has changed in two respects since the announcement of the *Beer* dictum. In 1980, in what was perceived by Congress to be a change in the standard applied in *White* v. *Regester*, a plurality of this Court concluded that discriminatory purpose is an essential element of a constitutional vote dilution challenge. See *Mobile* v. *Bolden*, 446 U. S., at 62. In reaction to that decision, in 1982 Congress amended § 2 by placing in the statute the language used in the *White* opinion to describe what is commonly known as the "results" standard for evaluating vote dilution challenges. See 96 Stat. 134 (now codified at 42 U. S. C. §§ 1973(a)–(b)); *Thornburg* v. *Gingles*, 478 U. S. 30, 35 (1986).[8] Thus Congress preserved, as a matter of statutory law, the very same standard that the Court had identified in *Beer* as an exception to the general rule requiring preclearance of nonretrogressive changes. Because in 1975 *Beer* required denial of preclearance for voting plans that violated the *White* standard, it follows that Congress, in preserving the *White* standard, intended also that the Attorney General should continue to refuse to preclear plans violating that standard.

That intent is confirmed by the legislative history of the 1982 Act. The Senate Report states:

> "Under the rule of *Beer* v. *United States*, 425 U. S. 130 (1976), a voting change which is ameliorative is not objectionable unless the change 'itself so discriminates on the basis of race or color as to violate the Constitution.' 425 U. S. at 141; *see also* 142 n. 14 (citing to the dilution cases from *Fortson* v. *Dorsey*[, 379 U. S. 433 (1965),] through *White* v. *Regester*). In light of the amendment to section 2, it is intended that a section 5 objection also follow if a new voting procedure itself so

at 484, of § 5 supports a denial of preclearance for at least some nonretrogressive changes.

[8] The amended version of § 2 tracks the language in *White* v. *Regester*, 412 U. S. 755, 766 (1973).

discriminates as to violate section 2." S. Rep. No. 97–417, p. 12, n. 31 (1982).

The House Report conveys the same message in different language. It unequivocally states that whether a discriminatory practice or procedure was in existence before 1965 (and therefore only subject to attack under §2) or is the product of a recent change (and therefore subject to preclearance under §5) "affects only the mechanism that triggers relief." H. R. Rep. No. 97–227, p. 28 (1981). This statement plainly indicates that the Committee understood the substantive standards for §2 and §5 violations to be the same whenever a challenged practice in a covered jurisdiction represents a change subject to the dictates of §5.[9] Thus, it is reasonable to assume that Congress, by endorsing the "unless" clause in *Beer*, contemplated the denial of preclearance for any change that clearly violates amended §2. The majority, by belittling this legislative history, abrogates Con-

---

[9] The postenactment legislative record also supports the Attorney General's interpretation of §5. In 1985, the Attorney General first proposed regulations requiring a denial of preclearance "based upon violation of Section 2 if there is clear and convincing evidence of such a violation." 50 Fed. Reg. 19122, 19131. Congress held oversight hearings in which several witnesses, including the Assistant Attorney General, Civil Rights Division, testified that clear violations of §2 should not be precleared. See Oversight Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, Proposed Changes to Regulations Governing Section 5 of the Voting Rights Act, 99th Cong., 1st Sess., 47, 149, 151–152 (1985). Following these hearings, the House Judiciary Subcommittee on Civil and Constitutional Rights issued a Report in which it concluded "that it is a proper interpretation of the legislative history of the 1982 amendments to use Section 2 standards in the course of making Section 5 determinations." Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, Voting Rights Act: Proposed Section 5 Regulations, 99th Cong., 2d Sess., Ser. No. 9, p. 5 (Comm. Print 1986). Although this history does not provide direct evidence of the enacting Congress' intent, it does constitute an informed expert opinion concerning the validity of the Attorney General's regulation.

gress' effort, in enacting the 1982 amendments, "to broaden the protection afforded by the Voting Rights Act." *Chisom* v. *Roemer*, 501 U. S. 380, 404 (1991).

Despite this strong evidence of Congress' intent, the majority holds that no deference to the Attorney General's regulation is warranted. The Court suggests that had Congress wished to alter "our longstanding interpretation" of § 5, Congress would have made this clear. *Ante,* at 483. But nothing in our "settled interpretation" of § 5, *ante,* at 484, is inconsistent with the Attorney General's reading of the statute. To the contrary, our precedent actually indicates that nonretrogressive plans that are otherwise discriminatory under *White* v. *Regester* should not be precleared. As neither the language nor the legislative history of § 5 can be said to conflict with the view that changes that clearly violate § 2 are not entitled to preclearance, there is no legitimate basis for refusing to defer to the Attorney General's regulation. See *Presley* v. *Etowah County Comm'n*, 502 U. S. 491, 508 (1992).

## II

In Part III of its opinion the Court correctly concludes that this action must be remanded for further proceedings because the District Court erroneously refused to consider certain evidence that is arguably relevant to whether the Board has proved an absence of discriminatory purpose under § 5. Because the Court appears satisfied that the disputed evidence may be probative of an "'intent to retrogress,'" it concludes that it is unnecessary to decide "whether the § 5 purpose inquiry ever extends beyond the search for retrogressive intent." *Ante,* at 486. For two reasons, I think it most unwise to reverse on such a narrow ground.

First, I agree with JUSTICE BREYER, see *ante,* at 493, that there is simply no basis for imposing this limitation on the purpose inquiry. None of our cases have held that § 5's purpose test is limited to retrogressive intent. In *Pleasant*

*Grove* v. *United States*, 479 U. S. 462, 469–472 (1987), for instance, we found that the city had failed to prove that its annexation of certain white areas lacked a discriminatory purpose. Despite the fact that the annexation lacked a retrogressive effect, we found it was subject to § 5 preclearance. *Ibid.;* see also *id.,* at 474–475 (Powell, J., dissenting) (contending that the majority erred in holding that a discriminatory purpose could be found even though there was no intent "to have a retrogressive effect"). Furthermore, limiting the § 5 purpose inquiry to retrogressive intent is inconsistent with the basic purpose of the Act. Assume, for example, that the record unambiguously disclosed a long history of deliberate exclusion of African-Americans from participating in local elections, including a series of changes each of which was adopted for the specific purpose of maintaining the status quo. None of those changes would have been motivated by an "intent to regress," but each would have been motivated by a "discriminatory purpose" as that term is commonly understood. Given the long-settled understanding that § 5 of the Act was enacted to prevent covered jurisdictions from "contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination," *South Carolina* v. *Katzenbach*, 383 U. S., at 335, it is inconceivable that Congress intended to authorize preclearance of changes adopted for the sole purpose of perpetuating an existing pattern of discrimination.

Second, the Court's failure to make this point clear can only complicate the task of the District Court on remand. If that court takes the narrow approach suggested by the Court, another appeal will surely follow; if a majority ultimately agrees with my view of the issue, another remand will then be necessary. On the other hand, if the District Court does not limit its consideration to evidence of retrogressive intent, and if it therefore rules against the Board, appellees will bring the action back and the Court would then have to resolve the issue definitively.

In sum, both the interest in orderly procedure and the fact that a correct answer to the issue is pellucidly clear should be sufficient to persuade the Court to state definitively that § 5 preclearance should be denied if Judge Kessler's evaluation of the record is correct.

Accordingly, while I concur in the judgment insofar as it remands the action for further proceedings, I dissent from the decision insofar as it fails to authorize proceedings in accordance with the views set forth above.