UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-30360

_____

WILLIAM H. PREJEAN, et al.,

Plaintiffs,

HARRY J. CHAUVIN; EMILE POCHE; NED C. GOLDSTON; DENNIS P.
LOUVIERE; EUGENE J. SCHEXNAYDER; and ROBERT J. HEATH,

Plaintiffs-Appellants,

v.

M.J. "MIKE" FOSTER, JR., et al.,

Defendants,

M.J. FOSTER, JR., Governor of the State of Louisiana; RICHARD
IEYOUB, Attorney General, State of Louisiana; W. FOX
MCKEITHEN, Secretary, State of Louisiana; and JERRY M. FOWLER,
Commissioner of Elections of the State of Louisiana,

Defendants-Appellees.

JON OREN, et al.,

Plaintiffs,

ROBERT J. HEATH; HARRY J. CHAUVIN; EMILE POCHE; NED C.
GOLDSTON; DENNIS P. LOUVIERE; and EUGENE J. SCHEXNAYDER,

Plaintiffs-Appellants,

v.

M.J. FOSTER, JR., Governor of the State of Louisiana, in his
official capacity, also known as Mike Foster; RICHARD IEYOUB,
Attorney General, State of Louisiana in his official capacity;
W. FOX MCKEITHEN, Secretary, State of Louisiana in his

**official capacity; and JERRY M. FOWLER, Commissioner of Elections of the State of Louisiana, in his official capacity,**

**Defendants-Appellees.**

---

**Appeal from the United States District Court for the Middle District of Louisiana**

---

October 2, 2000

Before REYNALDO G. GARZA, JONES and EMILIO M. GARZA, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Since 1986, Louisiana's method of electing judges has been under attack for its alleged infringement of voting rights. The most recent litigation resulted from the state's efforts to settle an earlier case by creating majority-minority electoral subdistricts within a number of its trial court districts. According to the plaintiffs, who reside and vote in the district of the 23rd Judicial District Court (23rd JDC), the settlement itself intentionally discriminates among voters and thus violates the 14th and 15th Amendments and Section 2(a) of the Voting Rights Act. The district court, no doubt frustrated by the recent vicissitudes of voting rights law, granted summary judgment for the state. We are constrained to reverse and remand for trial.

2

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The legislation at issue here, Act 780, responded to the many twists and turns of <u>Clark v. Edwards</u>, civil action No. 86-435-A,[1] filed in 1986.  In <u>Clark</u>, black voters asserted that the use of multi-member, at-large judicial districts diluted black voting strength in violation of the Fourteenth and Fifteenth Amendments of the Constitution as well as Section 2(a) of the Voting Rights Act.[2] Their vote dilution claims were predicated on <u>Thornburg v. Gingles</u>, 478 U.S. 30, 106 S.Ct. 2752 (1986), and involved all of the Louisiana courts of appeal and most of the state's 41 judicial district courts.

The federal district court initially found that the state's entire at-large scheme for judicial elections violated Section 2.  <u>Clark v. Edwards</u>, 725 F. Supp. 285, 302 (M.D. La. 1988).  Although minority vote dilution had not been proven in every district, the court enjoined elections for all family, district, and appellate courts until the state system could be revised.  The Louisiana legislature proposed a package of

---

[1]    This circuit and the Supreme Court ruled on aspects of <u>Clark</u> in <u>Clark v. Edwards</u>, 958 F.2d 614 (5th Cir. 1992)(order granting joint motion to dismiss appeals), and <u>Clark v. Roemer</u>, 500 U.S. 646, 111 S. Ct. 2096 (1991)(upholding the plaintiffs' Section 5 claims and ordering that future elections be enjoined from unprecleared judgeships).

[2]    Section 2(a), 42 U.S.C. § 1973(a), tracks the Fifteenth Amendment.

3

constitutional and statutory changes to address the court's ruling, but the voters rejected them.

The district court subsequently vacated the statewide injunction because it came to realize that Gingles requires district-by-district findings, and it issued revised findings that eleven districts, excluding the 23rd JDC, violated Section 2.[3] For those eleven districts, the court reluctantly concluded that subdistricts must be created to enhance minority judicial candidates' chances. Clark v. Roemer, 777 F. Supp. 445, 450 (M.D. La. 1990).

Both parties appealed, placing at issue the findings of Section 2 violations in some districts and the refusal to enter such findings in others, including the 23rd JDC. The imperative to end the struggle eventually yielded a settlement calling for revisions of fifteen judicial districts, including the eleven which had been covered by the district court's remedial order for subdistricting and the 23rd JDC. The Clark plaintiffs agreed to drop their challenges to the other districts. Obtaining preclearance by the U.S. Attorney General pursuant to Section 5 of

---

[3] The district court vacated an earlier finding of a Section 2 violation in the 23rd JDC in light of the fact that while there was evidence, *inter alia*, of polarized voting in the 23rd JDC in statewide elections, no local black-white judicial elections had occurred, and there was no evidence of black-white elections for other political offices. Although the Clark plaintiffs moved for reconsideration based on evidence of polarization in post-trial elections, the district court declined to reconsider. Thus, the district court never found a Section 2 violation in the 23rd JDC.

4

the Voting Rights Act was an essential component of the settlement, as preclearance was needed before elections could be held in the judicial districts. Preclearance of the plan was granted. Act 780 was the end result of the settlement agreement.[4]

Act 780 of the 1993 Regular Session of the Louisiana Legislature increased from four to five the number of district judges for the 23rd JDC, which covers Ascension, Assumption, and St. James Parishes. In the process, Act 780 created two electoral subdistricts within the district. In the whole district, the population ratio is about 70% white/30% black. Subdistrict one is 75% black, contains roughly 20% of the total population, and elects one of the five district judges for the 23rd JDC; subdistrict two is 80% white, contains roughly 80% of the total population, and elects four of the district judges. Alvin Turner became the first African-American judge in the 23rd JDC when he was elected in subdistrict one.

Critically, the jurisdiction of the judges elected under Act 780 covers all three parishes in the 23rd JDC. But because of subdistricting, voters in the black subdistrict may only elect one of the five judges and have no right to vote on the other four. Conversely, voters in the white subdistrict may vote for four of the trial judges but not for the fifth one. Any citizen may,

---

[4] The legislature first created a subdistricting plan (Act. 1069) in 1992, but it was never put into effect and was superseded by Act 780.

5

however, be a party in the court of a judge, or judges, he has been prohibited from voting on.

After considering cross-motions for summary judgment, the district court granted the defendants' motion. The plaintiffs filed a timely appeal.

## II.  STANDARD OF REVIEW

This court reviews the granting of summary judgment de novo and applies the same criteria as the district court. *See* Baker v. Putnal, 75 F.3d 190, 197 (5th Cir. 1996). Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 1551-52 (1999); *see also* FED. R. CIV. P. 56(c). If the moving party meets its burden, the non-movant must designate specific facts showing there is a genuine issue for trial. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

## III.  ANALYSIS

The appellants contend that in creating racially identifiable subdistricts for electing trial judges in the 23rd JDC, the statute effects an impermissible racial gerrymander. They point to the shape of the subdistricts, the racial statistics

6

submitted to the court, the <u>Clark</u> litigation history, and the state's Section 5 preclearance submissions as direct and circumstantial evidence that race was the "sole and singular motivation" for Act 780. As a result, plaintiffs assert, Act 780 violates the Equal Protection clause of the Fourteenth Amendment, the Fifteenth Amendment, and Section 2(a) of the Voting Rights Act, 42 U.S.C. § 1973(a).

The state defendants and black voter intervenors (collectively "the defendants") counter with an affidavit by Judge Turner, who states that race was not the predominant factor in drawing the subdistrict lines. Alternatively, the defendants contend that the districting plan implemented by Act 780 is narrowly tailored to meet the compelling state interests of complying with Sections 2 and 5 of the Voting Rights Act and of terminating the lengthy <u>Clark</u> litigation.

## A.    Fourteenth Amendment

The original purpose of the Equal Protection Clause of the Fourteenth Amendment is to prevent states from intentionally discriminating against persons on the basis of race. *See* <u>Washington v. Davis</u>, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047 (1976). Racial gerrymandering of electoral districts, which involves the "'deliberate and arbitrary distortion of district boundaries . . . for [racial] purposes,'" <u>Shaw v. Reno</u>, 509 U.S. 630, 640, 113 S.Ct.

7

2816, 2823 (1993)("Shaw I")(citation omitted), falls "within the core of that prohibition."  *Id.* at 642, 113 S.Ct. at 2824.

Given the presumption of the legislature's good faith in redistricting,[5] showing that a redistricting plan intentionally discriminates is not ordinarily an easy task.  A trial court must "perform a 'sensitive inquiry into such circumstantial and direct evidence as may be available.'"  Hunt v. Cromartie, 526 U.S. at 546, 119 S.Ct. at 1549 (1999)(quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564 (1977)).  Unlike statutes that explicitly classify people based on race, *see* Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 2293 (1979), "[a] reapportionment statute typically does not classify persons at all; it classifies tracts of land or addresses."  Shaw, 509 U.S. at 646, 113 S.Ct. at 2826.[6]  And as Bush makes clear, "[s]trict scrutiny does not apply merely because redistricting is performed with consciousness of race . . . .  Nor does it apply to all cases of intentional creation of majority-

---

[5]    This presumption, in turn, "may impact the assessment of the propriety of summary judgment in a suit challenging districts as racial gerrymanders."  Chen v. City of Houston, 206 F.3d 502, 505 (5th Cir. 2000)(citing Miller v. Johnson, 515 U.S. 900, 916-17, 115 S.Ct. 2475, 2488 (1995)).

[6]    The shape of a district may be so bizarre that the redistricting plan cannot be explained on grounds other than race.  See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125 (1960).  That is, some districts are "so highly irregular that [they] rationally cannot be understood as anything other than an effort to 'segregat[e] . . . voters' on the basis of race."  Shaw I, 509 U.S. at 646-47, 113 S.Ct. at 2826 (1993)(quoting Gomillion, 364 U.S. at 341, 81 S.Ct. at 127).  But a bizarre shape is not a sine qua non to plaintiffs' case for a racial gerrymander.  See Miller, 515 U.S. at 915, 115 S.Ct. at 2488.

8

minority districts." Bush v. Vera, 517 U.S. 952, 958, 116 S.Ct. 1941, 1951 (1996)(plurality opinion). A plaintiff must show that traditional districting principles were subordinated to race, i.e., that race was "the predominant factor motivating the legislature's [redistricting] decision." Miller, 515 U.S. at 916, 115 S.Ct. at 2488 (1995).[7]

Legislative motivation or intent is a paradigmatic fact question. Hunt, 526 U.S. at 549, 119 S.Ct. at 1550. Thus, the defendants are entitled to summary judgment only if there is no genuine question of material fact as to the intent of the Louisiana legislature in passing Act 780.

The district court summarized the plaintiffs' evidence as consisting of "the shape of the subdistricts, the racial statistics, the Clark litigation, and the Section 5 submittals by the State for preclearance of Act 780." But the court dismissed most of that evidence without discussion. According to the district court, "the circumstantial proof submitted by plaintiffs essentially boils down to their arguments relating to contiguity and compactness," *i.e.*, the shape of the districts. The court

---

[7]    *See* Hunt, 526 U.S. at 547, 119 S.Ct. at 1549 (internal citation omitted)(quoting Miller, 515 U.S. at 916, 115 S.Ct. at 2488) (In order to carry their burden, the plaintiffs must show "using direct or circumstantial evidence, or a combination of both, that 'the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.'").

relied on the affidavit of Judge Turner, formerly a lawyer in and unsuccessful candidate for an at-large judgeship in the 23rd JDC. Judge Turner drew the district lines prescribed in Act 780 for the 23rd JDC, and the legislature adopted his proposed subdistricting scheme. Judge Turner averred that race did not predominate over traditional districting principles; he stated that, while following traditional districting principles, he drew the district lines to accommodate his candidacy. The district court agreed, as it found plaintiffs' evidence was insufficient to cast doubt on the intent of the Louisiana legislature.[8]

If Judge Turner's affidavit describing his intent in drawing the subdistricts is taken as conclusive proof of the legislature's intent, then the district court's holding is consistent with Bush.[9] But this is not so. Unlike the legislator affiants who drafted the districting plan in Hunt (and whose

---

[8] According to Judge Turner, race was only one of several factors he considered in redrawing the district lines. Other factors included: contiguity, non-splitting of precincts, the one-person/one-vote principle, protection of incumbents, the political preference of incumbents to include parts of each parish in each subdistrict, and the location of Judge Turner's own supporters.

[9] *See* Bush, 517 U.S. at 964-65, 116 S.Ct. at 1956: "In some circumstances, incumbency protection might explain as well as, or better than, race a State's decision to depart from other traditional districting principles, such as compactness, in the drawing of bizarre district lines. And the fact that, '[a]s it happens, . . . many of the voters being fought over [by the neighboring Democratic incumbents] were African-American,' . . . would not, in and of itself, convert a political gerrymander into a racial gerrymander, no matter how conscious redistricters were of the correlation between race and party affiliation . . . . If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify . . . ."

10

affidavits were sufficient to defeat a motion for summary judgment but not secure summary judgment for the state), *see* 526 U.S. at 549, 119 S.Ct. at 1550, Judge Turner was not a member of the state legislature. The fact that the legislature adopted Judge Turner's districting plan without modification might support an inference that racial considerations did not predominate. As Hunt reminds, however, the district court was required to view the evidence and all inferences therefrom in the light most favorable to the non-movants, i.e., the appellants. Hunt, 526 U.S. at 552, 119 S.Ct. at 1551-52. Another equally plausible inference is that the legislature was ready to adopt whatever proposal would satisfy its objective of creating a black subdistrict. Indeed, in Bush, the trial court and the Supreme Court ultimately disbelieved the testimony of legislative employees and even state legislators to the effect that non-racial considerations motivated Texas's congressional redistricting, where the objective contemporary evidence showed otherwise. Bush, 517 U.S. at 972-73, 116 S.Ct. at 1958. The court here should have drawn all inferences in favor of the appellants and included in its consideration the evidence they adduced.

1. The Clark Settlement.

To end the Clark litigation, and to address the Justice Department's Section 5 objections, the state agreed to implement a

11

subdistrict election plan in the 23rd JDC, among others, that would "contain at least one subdistrict with a majority black voter registration." Act 780 added a new judgeship for this purpose and created a subdistrict in the 23rd JDC. Contrary to Judge Turner's statement that politics as opposed to race motivated Act 780, the history of the Act and the quoted language from the settlement agreement, when viewed in the light most favorable to the nonmovants, strongly suggest that traditional districting principles were subordinated to racial considerations.

2.   Section 5 Preclearance Submissions.

The ballet between the state and the U.S. Justice Department over Section 5 preclearance leading up to Act 780 reinforces the sense of legislative preoccupation with the racial makeup of judicial districts. Coincidentally, this time period corresponds with the Justice Department's pressing Georgia to effectuate a "max-black" congressional districting plan later overturned as a racial gerrymander by the Supreme Court in <u>Miller</u>.

Until 1992, the Department of Justice ("DOJ") refused to preclear the various changes to the judicial election process proposed by the Louisiana legislature. Correspondence between DOJ and the State shows DOJ, unconcerned with Louisiana's adherence to

12

traditional principles like incumbency protection,[10] denying preclearance unless "black voters clearly would have the opportunity to elect candidates of their choice." In fact, preclearance occurred only after Louisiana agreed to implement at least one majority-black subdistrict for each judicial district that concerned DOJ.

Ongoing correspondence between DOJ and the State of Louisiana is not dispositive as to legislative intent, but the "historical background of the decision is one evidentiary source" that must be considered. Arlington Heights, 429 U.S. at 267, 97 S.Ct. at 564. "And the Justice Department's implicit command that States engage in presumptively unconstitutional race-based districting brings the [Voting Rights] Act . . . into tension with the Fourteenth Amendment." Miller, 515 U.S. at 927, 115 S.Ct. at 2493. At the summary judgment stage, one could readily infer that the state was motivated to pass Act 780 by the desire to secure Section 5 preclearance, which, under DOJ's policy, meant creating racially-based subdistricts. As the trial court found in Miller, "'it became obvious,' both from the Justice Department's objection letters and the three preclearance rounds in general, that [the

---

[10] In a 1990 letter to the Louisiana Attorney General's office, the DOJ stated that "the State's failure and refusal to adopt any remedial measures without also seeking to protect incumbents, the vast majority of whom are white, would appear to be elevating the State's concern for protecting white incumbents over the vindication of minority voting rights." The DOJ's letter may be interpreted as requiring the legislature to focus on vindicating minority voting rights, not other traditional districting principles.

13

DOJ] would accept nothing less than abject surrender to a [minority district] maximization agenda." *Id.*, 515 U.S. at 917, 115 S.Ct. at 2489.

In the state Attorney General's summary of Act 780 within the state's preclearance submission, the state forthrightly declared that the reason for the change to the 23rd JDC was to "reapportion the 23rd Judicial District Court, with election Section one having a majority black population and electing one judge . . . ." The Attorney General also officially announced that under Act 780, "one of the district's election Sections will be comprised of a majority of black voters."[11]  Thus, the only contemporaneous statements attributable to the State suggest that the major purpose of the Act was to create a majority-minority subdistrict in the 23rd JDC.

That the state was rushing headlong into the arms of DOJ regardless of legal consequences might also be inferred from the drastic nature of the changes in judicial election procedures that the state agreed to. While the Supreme Court has held that Section 2 vote dilution claims may be asserted concerning elections of judges, it also agreed that the state may have strong policies

---

[11]     The Supreme Court has noted that statements by the Attorney General can provide "powerful evidence that the legislature subordinated traditional districting principles to race . . . ." Miller, 515 U.S. at 919, 115 S.Ct. at 2490.  Although the Attorney General's statements in this case, unlike Miller, do not explicitly state that traditional principles were not followed, the statements still provide prima facie evidence of the State's focus on racial considerations in passing Act 780.

favoring multimember districts, which ought to be evaluated in the totality of the circumstances liability inquiry or in the remedial phase of suit. Houston Lawyers' Association v. Atty. General of Texas, 501 U.S. 419, 426-27; 111 S.Ct. 2376, 2381 (1991). Indeed, this court on remand of the Houston Lawyers' case ultimately found no Section 2 violation in part because it is essential to the responsiveness, independence and fairness of an elected judiciary that trial judges not be balkanized into small constituencies within the district for which they are responsible. League of United Latin American Citizens (LULAC) v. Clements, 999 F.2d 831, 872-74 (5th Cir. 1993) (en banc). In 1991, Louisiana might not have foreseen the conclusion of the LULAC case, but surely it understood that the Supreme Court considered judicial elections to invoke more complex voting rights problems than legislative elections. Nevertheless, the state stifled its policy arguments to obtain final preclearance.

3.    Racial Statistics.

Another powerful indicator of the state's intent is the demographic information used by the legislature and submitted to the DOJ in support of Section 5 preclearance. The data refer only to the racial composition of the 23rd JDC's total population and voting age population -- facts which the Supreme Court takes to be significant, where, as here, "at the time of the redistricting, the State had compiled detailed racial data for use in redistricting,

15

but made no apparent attempt to compile, and did not refer specifically to, equivalent data regarding communities of interests." Bush, 517 U.S. at 967, 116 S.Ct. at 1955.

4. Traditional Districting Principles.

Finally, the district court failed to draw all justifiable inferences in the appellants' favor with respect to the subordination of traditional districting principles such as compactness, contiguity and maintaining communities of interest.[12] Traditional districting principles are important "not because they are constitutionally required . . . but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines." Shaw I, 509 U.S. at 647, 113 S.Ct. at 2827. The district court minimized the appellants' evidence based on Judge Turner's affidavit and the appellants' admission that the subdistricts are "technically compact and contiguous." The court misperceived appellants' position.

At first glance, the shape of the majority-black subdistrict in the 23rd JDC is not as ungainly as the districts in Shaw or Gomillion. But upon closer inspection, the construction of the judicial subdistricts appears problematic. In this respect,

---

[12] Furthering another traditional districting principle, however, Act 780 protects judicial incumbents by adding a black subdistrict to the 23rd JDC and allowing the four previously-authorized judges to run in the majority-white subdistrict. This situation hardly reinforces a claim of the legislature's race-neutrality.

16

the 23rd JDC resembles the Eleventh District at issue in Miller: "Although by comparison with other districts the geometric shape of the [district] may not seem bizarre on its face, when its shape is considered in conjunction with its racial and population densities, the story of racial gerrymandering . . . becomes much clearer." 515 U.S. at 917, 115 S.Ct. at 2489.[13]

As the district court noted, Act 780 divides its three constituent parishes as well as three municipalities (Lutcher, Donaldsonville, and Gonzales). The majority-black subdistrict, situated roughly in the middle of the district, contains precincts in each of the Parishes and each of the municipalities. Several parts of the subdistrict protrude out to include predominately black populations. For example, the "Lutcher thrust" is a thin, finger-like extension that, at its tip, encompasses part of the city of Lutcher. Although the population of Lutcher is roughly 50% black, the portion of Lutcher included in the majority-black subdistrict is 99.4% black. Similarly, in Ascension Parish the majority-black subdistrict incorporates only part of the city of Donaldsonville, but that portion contains a 79% black population, compared to about 59% black citizenry of Donaldsonville. The City

---

[13] See Chen v. City of Houston, 206 F.3d 502, 507 (5th Cir. 2000): "A plaintiff may demonstrate that race predominated in a districting decision by introducing circumstantial evidence of the district's shape and demographics," and if shape alone is not dispositive, the plaintiffs can still establish "their circumstantial case by demonstrating that the districts are sufficiently bizarre in relation to racial demographics and population densities."

of Gonzales has a 24% black population, but the portion of Gonzales allocated to the black subdistrict is 62% black.

The splitting of communities also affects the majority-white subdistrict.[14] The second subdistrict is populated from three disconnected and isolated geographical areas: northern Ascension, southern Assumption, and eastern St. James Parishes. Contiguity does not exist: an uninhabitable swamp separates these areas. It is impossible to travel among the three disconnected portions of the second subdistrict while remaining in that subdistrict.

The disregarding of township lines is probative.

> A state is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests. '[W]hen members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes.'

Miller, 515 U.S. at 920, 115 S.Ct. at 2490 (quoting Shaw I, 509 U.S. at 646, 113 S.Ct. at 2826).[15] But according to the Supreme

---

[14] The Equal Protection Clause's "central mandate is racial neutrality in governmental decisionmaking . . . This rule obtains with equal force regardless of 'the race of those burdened or benefitted by a particular classification.'" Miller v. Johnson, 515 U.S. 900, 904, 115 S.Ct. 2475, 2482 (1995)(citation omitted).

[15] In Chen, this court cautioned against relying too heavily on communities of interest: "Because of the inherently subjective nature of the concept, it would seem that reasonable people might disagree as to what constitutes a community. We thus caution against general over-reliance on the communities of interest factor." 206 F.3d at 517 n.9. The Supreme Court, though, has repeatedly taken communities of interest to be a relevant factor. See Miller, 515 U.S. at 916, 115 S.Ct. at 2488 ("traditional race-neutral districting principles, including . . . communities defined by actual shared interests."); Bus, 517 U.S. at 963, 116 S.Ct. at 1953-54. This court, therefore, analyzes the communities of interest factor mindful of Chen's admonition.

18

Court, a community of interest is manifested by "for example, shared broadcast and print media, public transport infrastructure, and institutions such as schools and churches . . . ." Bush, 517 U.S. at 964, 116 S.Ct. at 1954. The parish and town-splitting subdistricts created by Act 780 may be characterized as defying the notion of a "common thread of interests."[16]

Judge Turner's affidavit supported the district court's finding that even if the appellants' statistical data established a prima facie case of racial discrimination, any "deviations from traditional districting principles . . . are due to politics rather than race." Judge Turner states that he drew the district lines with an eye toward including his political supporters from his previous attempts at elective office. Laying aside the disjunction noted earlier between Judge Turner's intent and the intent of the legislature, this aspect of his affidavit, viewed from the plaintiffs' perspective, is quite unsatisfactory. There is no supporting documentation showing who his supporters were, and where they would be found -- or not found -- in the proposed subdistrict. No evidence of his previous candidacies' vote distribution was

---

[16]    Thus, this case differs from Bush where the Court found one reason "[t]raditional districting criteria were not entirely neglected" was that "each of the three districts takes its character from a principal city and the surrounding urban area."  517 U.S. at 963, 116 S.Ct. at 1953-54. *See also id.*, 517 U.S. at 974, 116 S.Ct. at 1961 ("Not only are the shapes of the districts bizarre; they also exhibit utter disregard of city limits . . . ."); Shaw I, 509 U.S. at 629-30, 113 S.Ct. at 2821 (finding a racial gerrymander where the district "winds in snakelike fashion through tobacco country, financial centers, and manufacturing areas . . . [and] even towns are divided.").

offered. Yet Judge Turner's statement cries out for objective verification.[17] In the absence of evidence showing the requisite correlation between race and support for Judge Turner, there is a legitimate concern that race is used as a proxy for politics:

> If the district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify . . . But to the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation.

Bush, 517 U.S. at 968, 116 S.Ct. at 1956.[18]

In contrast to Judge Turner's statements, neither the Attorney General's announcements, the data accompanying the Section 5 submittals, nor the DOJ correspondence discusses traditional

---

[17] The plaintiffs contend that when Judge Turner was deposed, he was ordered to bring all documents and records used to construct the new subdistricts but that he produced only racial summaries of the number of black registered voters in the precincts included/excluded from the new 75% black subdistrict. The plaintiffs argue that they should be allowed to cross-examine Judge Turner at trial using such evidence.

[18] *See* Miller, 515 U.S. at 914, 115 S.Ct. at 2487 (internal citations omitted):

> It is true that redistricting in most cases will implicate a political calculus in which various interests compete for recognition, but it does not follow from this that individuals of the same race share a single political interest. The view that they do is 'based on the demeaning notion that members of the defined racial groups ascribe to certain "minority views" that must be different from those of other citizens,' the precise use of race as a proxy the Constitution prohibits.

*See also* Bush, 517 U.S. at 966, 116 S.Ct. at 1955 (disregarding the community of interest justification because it was not clear that such data were before the legislature in an organized fashion); Shaw II, 517 U.S. at 908 n.4, 116 S.Ct. at 1902 n.4 (purported justification must be actual purpose in adopting plan and supported in the evidence).

districting principles. Viewed in the light most favorable to the nonmovants, one could infer that the legislature was motivated primarily by racial considerations, i.e., the creation of a majority-black subdistrict, in order to comply with the Clark settlement.

As a result of all this evidence, a "sensitive inquiry into" the present summary judgment record reveals that "[a]ll that can be said on the record before us is that motivation was in dispute. Reasonable inferences from the undisputed facts can be drawn in favor of a racial motivation finding or in favor of a political motivation finding." Hunt, 119 S.Ct. at 1552. As a result, since "[t]he legislature's motivation is itself a factual question," id. at 1550, "it was error in this case for the District Court to resolve the disputed fact of motivation at the summary judgment stage." Id. at 1552. Although Judge Turner's affidavit provides some insight into the legislature's intent, it is far from determinative. The appellants' evidence raises a factual issue as to whether race was the predominant motivation, and the grant of summary judgment on the Equal Protection claim is, therefore, vacated and remanded.

B. **Justification of Race-Based Districts**

The district court, finding no predominately racial motive for configuring the 23rd JDC, rejected plaintiffs'

21

Fourteenth Amendment challenge, but he alternatively ruled that even if he was in error, and strict scrutiny applies, the state met its burden of justifying racially-based subdistricts. That is, the state proved compelling interests for passing Act 780, and the racial subdistricts were narrowly tailored to achieve the state's purposes. When both these criteria are satisfied, a governmental body may sustain a racially-motivated district. <u>Bush</u>, 517 U.S. at 977, 116 S.Ct. at 1960. Each of these criteria requires separate analysis.

1. Compelling state interests.

<u>Bush</u> grants that the state has a compelling interest in complying with the results test of Section 2 of the Voting Rights Act,[19] which may lead it to create a majority-minority district only when it has a "strong basis in evidence" for concluding, or a "reasonable fear" that, otherwise, it would be vulnerable to a vote dilution claim. <u>Bush</u>, 517 U.S. at 994, 116 S.Ct. at 1970 (O'Connor, J., concurring); *see also id.*, 517 U.S. at 978, 116 S.Ct. at 1961. The district court readily – perhaps too readily – found that a "reasonable fear" of liability existed. Just a year or so before the settlement, it had vacated a blanket liability decision against the 23rd JDC and had refused to reconsider even after the <u>Clark</u> plaintiffs submitted new evidence. Nevertheless,

---

[19] <u>Bush</u> assumes this interest <u>arguendo</u>, citing prior authority. <u>Bush</u>, 517 U.S. at 977, 116 S.Ct. at 1960.

22

the district court's reasoning on the "statistical" preconditions of Section 2 vote dilution liability is not subject to review, as appellants failed to challenge it in their opening brief; appellate points may not be asserted for the first time in a reply brief.

The appellants did timely make two arguments contesting the "substantial basis in evidence" alleged by the state.  First, plaintiffs argue that as a matter of law, there is no remedy for a vote dilution challenge to judicial districts because there is no benchmark by which to measure vote dilution.  This argument derives from the Supreme Court's opinion in Holder v. Hall, 512 U.S. 874, 114 S.Ct. 2581 (1994), which analyzed a vote dilution claim against a Georgia county with a unitary executive post.  Black voters, objecting to their inability to elect a "candidate of their choice," sought relief in the form of a multimember executive post like those in some other Georgia counties.  The Supreme Court held that federal courts cannot order a change in the size of a governing body as a Section 2 remedy:

> In a § 2 vote dilution suit, along with determining whether the Gingles preconditions are met and whether the totality of the circumstances supports a finding of liability, a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice.

<u>Holder v. Hall</u>, 512 U.S. at 880, 114 S.Ct. at 2585 (1994)(footnote omitted).[20]

From the plaintiffs' point of view, <u>Holder</u> ought to preclude subdistricting of judges in the 23rd JDC because each judge is like the independent county executive in Bleckley County, Georgia, and no benchmark exists to measure "dilution" of minority votes for such a unitary post. Construing <u>Holder</u> in this way, however, creates some tension with the Court's judicial vote dilution cases. <u>Chisom</u> held that a Section 2 dilution claim is maintainable against an elected appellate bench, a body superficially symmetrical to a multimember legislature, <u>Chisom v. Roemer</u>, 501 U.S. 380, 111 S.Ct. 2354 (1991); and on the same day that <u>Chisom</u> was issued, the Court decided <u>Houston Lawyers</u>', which carried the possibility of a Section 2 violation into an electoral system exactly like that for trial judges in <u>Clark</u>: district-wide elections for multiple trial judges whose jurisdiction is independent and co-extensive with the district boundaries. While <u>Holder</u> may preclude some solutions to judicial vote dilution

---

[20]    A district court cannot simply assume that racial subdistricting is such a benchmark. In <u>Holder</u>, the Court stated, "[o]ne gets the sense that [the appellees] and the United States have chosen a benchmark for the sake of having a benchmark. But it is one thing to say that a benchmark can be found, quite another to give a convincing reason for finding it in the first place." 512 U.S. at 880, 114 S.Ct. at 2586). Justice O'Connor's concurrence explained that, by contrast, benchmarks do exist for federal courts in Section 2 challenges to multimember, at-large systems where the plaintiffs do not challenge the size of the elective body. <u>Holder</u>, 512 U.S. at 888, 114 S.Ct. at 2589 (O'Connor, J., concurring).

24

claims, this court has squarely held that <u>Holder</u> applies to the election of "'judges whose responsibilities are exercised independently in an area coextensive with the district from which they are elected.'" <u>Concerned Citizens for Equal. v. McDonald</u>, 63 F.3d 413, 417 (5th Cir. 1995) (quoting <u>Houston Lawyers</u>', 501 U.S. at 424, 111 S.Ct. at 2380). Whatever the tension between <u>Holder</u> and <u>Houston Lawyers</u>', it is beyond this court's power and duty to resolve in the case before us. We need only conclude that <u>Holder</u>'s theory did not furnish a Section 2 defense to Louisiana as a matter of law and, at best, constituted one of the imponderables that inspired the state's settlement.

The appellants' second argument why the state had no strong basis in evidence or reasonable fear that it faced Section 2 liability is far more persuasive. They point to the state's interest in "linkage" between judicial offices and the citizens over whom the judges preside. Linkage, embodied in district-wide elections, promotes the actuality as well as perception of judicial impartiality and responsiveness to all citizens of the district. Subdistricts, on the other hand, can render judges vulnerable to insular prejudices of their constituents or to targeted attacks by powerful interest groups. Indeed, racial subdistricts tend to limit rather than extend the influence of minority voters for whom such districts are ostensibly created. <u>Houston Lawyers</u>' found the state's interest in linkage relevant to the totality of the

25

circumstances aspect of the test for Section 2 liability and suggests that the interest may possibly "preclude a remedy that involves redrawing boundaries or subdividing districts. . ." Houston Lawyers', 501 U.S. at 426, 111 S.Ct. at 2381. The case was accordingly remanded to this court, which found, *inter alia*, that the state's interest in linkage militated against finding Section 2 liability.

The potential importance of linkage was clearly stated in Houston Lawyers', which was decided before the state completed its settlement with the Clark plaintiffs and obtained preclearance for the new 23rd JDC subdistrict boundaries. While it is true that the state's interest in linkage is not a defense as a matter of law against a judicial vote dilution claim, that interest must be considered in the totality of the circumstances test, it must be balanced against the evidence of actual vote dilution, and it may preclude a subdistricting remedy. *See* Houston Lawyers, 501 U.S. at 426, 111 S.Ct. at 2381; LULAC, 999 F.2d at 869, 876.[21] At the very least, the district court should have considered the importance of linkage as an element in determining whether a "strong basis in

---

[21] Appellants point out that every circuit opinion to address the linkage argument has used it to reject judicial vote dilution claims. Mallory v. Ohio, 173 F.3d 377 (6th Cir. 1999); Milwaukee Branch of the NAACP v. Thompson, 116 F.3d 1194 (7th Cir. 1997); Southern Christian Leadership Conf., Inc. v. Sessions, 56 F.3d 1281 (11th Cir. 1995) (en banc); Cousin v. McWherter, 46 F.3d 568 (6th Cir. 1995); Nipper v. Smith, 39 F.3d 1494 (11th Cir. 1994) (en banc). While this history subsequent to Houston Lawyers' does not conclusively prove the potency of the linkage argument, the uniformity of the precedents should cause the district court to evaluate it with much greater care.

evidence" undergirded the state's fear of Section 2 liability. Unfortunately, it did not do so. Inasmuch as the balancing of the linkage interest against vote dilution evidence embodies factual findings, our court cannot make the determination as a matter of law, and the case must be remanded.

The state advances several arguments against further review of, or as the state puts it, a collateral attack on the Clark litigation settlement. First, the state contends, it is not the function of racial districting challenges brought under Shaw v. Reno to relitigate Section 2 cases (the Clark litigation) that gave rise to a particular remedial scheme. On the contrary, where, as in Shaw and progeny, it has been determined that racially-motivated districting occurred, even districts that were created pursuant to settlements of prior litigation may be scrutinized for constitutional compliance.[22] The Constitution forbids racially discriminatory districts unless a compelling state interest supports the state's decision. The Supreme Court insists on a "substantial basis in evidence" supporting the State's action to emphasize the gravity of race-based decisionmaking in our society. This test itself demands a hindsight review of the evidence before the state when it configured a district, whether that evidence was

_____

[22] "It has long been established that res judicata is no defense where, between the first and second suits, there has been an intervening change in the law, or modification of significant facts creating new legal conditions." Jackson v. DeSoto Parish Sch. Bd., 585 F.2d 726, 729 (5th Cir. 1978).

27

developed to obtain preclearance, as in <u>Miller</u>, or here, to settle a lawsuit.

Of course, "the 'narrow tailoring' requirement of strict scrutiny allows the States a limited degree of leeway in furthering [state] interest [in complying with the results test]." <u>Bush</u>, 517 U.S. at 977, 116 S.Ct. at 1960. Thus, latitude is afforded the state's judgment in reaching a settlement. And, contrary to the state's expressed concerns, it is highly unlikely that the scrutiny required by <u>Shaw</u> or <u>Bush</u> will reopen hundreds of extant redistricting consent decrees or settlements. As the new millennium dawns, redistricting will be undertaken by legislators across the nation with the precepts of the Constitution, as articulated in <u>Shaw</u> and its progeny, fully in mind. The past decade's settlements are about to become moot.

The state also asserts that these plaintiffs should not rely on a linkage argument, because the state itself declines to do so while defending Act 780. Surely the state should not ignore the provisions of Louisiana's Constitution that strongly support the election of judges by the people and correlate with the linkage

28

argument.[23]  Such provisions are intended to be relied upon by Louisiana's citizens.

Finally, the state contends that the district court has already rejected the linkage argument, and we should respect its ruling.  What the state omits to note is that the district court's discussion of linkage occurred in the very opinion in which it rejected a finding of vote dilution in the 23rd JDC.  Clark, 777 F.Supp. at 466-68.  The court's opinion discussed linkage concerning only the 11 districts in which it then found voting rights violations, and even as to those districts, the court did not consider linkage in the way prescribed later by Houston Lawyers' and LULAC, *supra*.  The district court's earlier decision is irrelevant to the present case.[24]

---

[23]  Since 1868, the Louisiana Constitution has consistently required election of judges by the qualified voters in their respective districts.  *See e.g.*, Const. of State of Louisiana 1974, Art. 5, § 22(A), Art. 14, § 16.  The trial court previously acknowledged that Louisisna's "constitutional and statutory policies demonstrate a strong preference for the election of judicial officers by majority vote."  Clark, 777 F.Supp. at 466.

[24]  The state cannot rely on the need to obtain Section 5 preclearance as a compelling state interest, since DOJ's policies in the early 1990's, which were apparently followed in this case, have been held to exceed its Section 5 authority.  Section 5 preclearance does not, by itself, guarantee that the legislation comports with constitutional requirements: "Indeed, the Voting Rights Act and our case law make clear that a reapportionment plan that satisfies § 5 still may be enjoined as unconstitutional."  Shaw I, 509 U.S. at 654, 113 S.Ct. at 2831; *see also* Miller, 515 U.S. at 922, 115 S.Ct. at 2491 ("We do not accept the contentions that the State has a compelling interest in complying with whatever preclearance mandates the Justice Department issues.").  Moreover, the Court has held that a proposed voting change may not be denied preclearance just because it violates Section 2.  Reno v. Bossier Par. Sch. Bd., (Bossier I), 520 U.S. 471, 486-87, 117 S.Ct. 1491 (1997).  The second Supreme Court case involving Bossier Parish held that a discriminatory but nonretrogressive purpose is insufficient to deny preclearance.  Reno v. Bossier Parish Sch. Bd., (Bossier II), ____ U.S. ____, 120 S.Ct. 866 (2000).  Finally, Section 5 may not be used

29

2.  Whether Act 780 is narrowly tailored

Even assuming that Louisiana had a strong basis in evidence for assuming that a Section 2 violation would be found in the 23rd JDC, the record evidence fails to establish that Act 780 is narrowly tailored. Since "[r]edistricting to remedy found violations of § 2 of the Voting Rights Act by definition employs race," Clark v. Calhoun County, Miss., 88 F.3d 1393, 1408 (5th Cir. 1996), remedial racial subdistricting does not automatically violate the Fourteenth and Fifteenth Amendments. But although the state has "a 'significant state interest in eradicating the effects of past racial discrimination' . . . compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws." Miller, 515 U.S. at 920-21, 115 S.Ct. at 2490-91.

The district court held that Judge Turner's affidavit, coupled with the Clark litigation history, was sufficient to preclude a genuine issue of material fact as to the

---

as a vehicle to require maximization of majority-minority districts apart from the nonretrogression principle in the statute. "[T]he purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." Beer v. United States, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363 (1976). As Bush makes clear, "[n]onretrogression is not a license for the State to do whatever it deems necessary to ensure continued legal success; it merely mandates that the minority's opportunity to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions." 517 U.S. at 982-83, 116 S.Ct. at 1963.

"reasonableness" of the remedy. This reasoning is conclusional rather than analytical. Narrow tailoring demands an explanation that the district chosen entails the least race-conscious measure needed to remedy a violation. Judge Turner's affidavit does not help in this regard since it fails to consider alternative districting plans presented in the summary judgment record or the percentage of white crossover voting that might justify smaller racial super-majorities in the districts. The parties disagree, and the record does not resolve the uncertainty surrounding these subdistricts, which have unusually high white (80%) and black (75%) populations. In short, genuine, material fact issues precluded the district court's peremptory conclusion that the 23rd JDC is narrowly tailored.

## C.   Fifteenth Amendment

The Fifteenth Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1; *see also* Section 2(a) of the Voting Rights Act. The appellants contend that Act 780 abridged their right to vote for all district judges in the 23rd JDC by instituting racially gerrymandered subdistricts. As this court has recognized, "[s]ubdistricting would partially disenfranchise citizens to whom all district judges in a county are

now accountable." League of United Latin American Citizens, Inc. v. Clements, 999 F.2d 831, 873 (5th Cir. 1993). Thus, subdistricting done for predominately racial reasons violates the Fifteenth Amendment and Section 2(a).

The district court summarily dismissed these claims, as it held that "there was no constitutional right to vote for a certain number of judges." This general principle is undoubtedly sound, since "'judges need not be elected at all,'" Chisom, 501 U.S. at 400, 111 S.Ct. at 2366 (citation omitted), the U.S. Constitution does not guarantee the right to vote for some minimum number of judges. However, having decided in its state constitution to elect its judges, Louisiana cannot abridge the right of citizens in the 23rd JDC to vote for trial judges for predominately racial reasons. Redistricting legislation must still pass Fifteenth Amendment muster:[25]

> All citizens, regardless of race, have an interest in selecting officials who make policies on their behalf, even if those policies will affect some groups more than others. Under the Fifteenth Amendment voters are treated not as members of a distinct race but as members of the whole citizenry.

Rice, __ U.S. __, 120 S.Ct. at 1060. As Chisom explains, judges are "representatives" that engage in policymaking at some level,

---

[25]    *See* Gomillion, 364 U.S. at 345, 81 S.Ct. at 129): "[s]tate authority over the boundaries of political subdivisions, 'extensive though it is, is met and overcome by the Fifteenth Amendment to the Constitution.'" .

32

501 U.S. 380, 399, 111 S.Ct. 2354, 2366 (1991). Thus, the Fifteenth Amendment "establishes a national policy . . . not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." Terry v. Adams, 345 U.S. 461, 467, 73 S.Ct. 809, (1953).

The state objects that allowing consideration of a Fifteenth Amendment claim in this case will affect all voting rights cases in which majority-minority remedial subdistricts have been created. Because of the nature of the elective offices at issue here, we disagree. It is difficult to hypothesize a denial or abridgement of the right to vote effected by the remedial subdistricting of a multimember legislative body. Indeed, the Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action. *See* Bossier II, _____ U.S. at _____, 120 S.Ct. at 875, n.3, (2000), (citing Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490 (1980)). When a legislative body is apportioned into districts, every citizen retains equal rights to vote for the same number of representatives, even if not for all of them, and every citizen's ballot is equally weighed.

But judicial elections for trial judges are different. Each judge presides individually and independently over the entire 23rd JDC. When subdistricts are created, voters are denied the

33

right to elect officers who (a) may preside over cases in which the voters become involved and (b) will inevitably affect the district's law and policies. If the subdistricting is done with racially discriminatory intent, voters in each subdistrict are just as disenfranchised with respect to the judges they are cut off from electing as were the black voters excluded from the city limits of Tuskagee, Alabama in Gomillion. In this case, black voters who could previously vote for all four district judges may now vote for only one of five.

It is also no objection to assert that because the districts are not racially pure, no Fifteenth Amendment violation may be inferred. In Rice, the Supreme Court's majority acknowledged that Hawaii's classification of native Hawaiian voters on the basis of "ancestry" had a somewhat arbitrary racial impact, 120 S.Ct. at 1056-57, but because it was intentionally discriminatory, a Fifteenth Amendment violation resulted.

As with the Fourteenth Amendment racial gerrymandering claim, however, the question of discriminatory intent to disenfranchise voters of the 23rd JDC in violation of the Fifteenth Amendment and Section 2(a) cannot be resolved as a matter of law, and this claim must also be remanded for trial. Unlike the Fourteenth Amendment claim, there is no room for a compelling state interest defense, as the Fifteenth Amendment's prohibition is absolute.

34

## IV.

## CONCLUSION

For the foregoing reasons, the district court erred in granting summary judgment for the state. The case is reversed and remanded for further proceedings in accordance with this opinion.

**REVERSED** and **REMANDED**.