351 F.Supp.2d 1326 (2004)
JACKSONVILLE COALITION FOR VOTER PROTECTION, the Southern Christian Leadership Conference, Service Employees International Union AFL-CIO, CLC, Michael McKinney, and Sarah Bussard, Plaintiffs,
v.
Glenda HOOD, as Secretary of State for the State of Florida; William Scheu, as Interim Supervisor of Elections of Duval County; and Richard Carlberg, as Assistant Supervisor of Elections, Defendants.
No. 3:04CV1123-J-20-MMH.
United States District Court, M.D. Florida, Jacksonville Division.
October 25, 2004.
*1327 *1328 Ari N. Rothman, John W. Nields, Jr., Laura S. Shores, Howrey Simon Arnold & White, LLP, Washington, DC, Wade Martin Rolle, Law Office of Wade Martin Rolle, Jacksonville, FL, Judy Scott, Service Employees International Union AFL-CIO, CLC, Washington, DC, for Plaintiffs.
Ernst D. Mueller, Scott D. Makar, Jacksonville, FL, for Defendants.

ORDER
SCHLESINGER, District Judge.
Before the Court is Plaintiffs' Verified Complaint for Preliminary and Permanent Injunctive and Declaratory Relief (Doc. No. 1, filed October 19.2004) and Plaintiffs' Emergency Motion for Preliminary Injunction and for Expedited Hearing (Doc. No. 3, filed October 20, 2004). Defendants Scheu and Carlberg have filed a Response to Plaintiffs' Emergency Motion (Doc. No. 9, filed October 22, 2004). Because of the exigent circumstances, the Court held a hearing on the Emergency Motion on Friday, October 22, 2004. All Parties were represented at the hearing, and the Court appreciates the lawyers preparing their presentations on such short notice.
FACTUAL BACKGROUND
There can be little disagreement that the election system in Florida suffered numerous attacks in the wake of the 2000 election. For example, the United States Commission on Civil Rights estimated that the rate of rejection for votes cast by African-American voters in Duval County was 23.6 percent, compared to a 5.5 percent rejection rate for non-African-American voters. In sum, the Commission majority concluded that many Floridian voters had been denied their right to vote and that this disenfranchisement disproportionately affected African-American voters. While there was a dissenting portion of that report, the underlying reason that caused voters to improperly cast their votes and then have those votes rejected (for example, over voting for more than one candidate for an office) is not explained in either portion of the report. In part as a response to the problems encountered by many voters in 2000, the Florida legislature amended the Early Voting Statute, Florida Statutes, section 101.657(1)(a) (2004). which states:
The supervisor of elections shall allow an elector to vote early in the main or branch office of the supervisor by depositing the voted ballot in a voting device used by the supervisor to collect or tabulate ballots. In order for a branch *1329 office to be used for early voting, it shall be a full-service facility of the supervisor and shall have been designated as such at least 1 year prior to the election. The supervisor may designate any city hall or public library as early voting sites; however, if so designated, the sites must be geographically located so as to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable. The results or tabulation may not be made before the close of the polls on election day.
While many Americans are familiar with the use of absentee ballots by those who are ill, out of town, or otherwise unable to get to the polls on election day, fewer Americans are aware of early voting programs. The Court has ascertained that approximately thirty states currently allow some form of early voting. CNN. America Votes 2004-Early Voting States. http:// www.cnn.com/ELECTION/2004/ (accessed October 24, 2004). These states utilize early voting either by mail, in person, or a combination of the two. The length of time early voting is available in each state varies widely, from Idaho where early voting began September 14 to Oklahoma where early votes cannot be cast until October 29. The majority of states involved in early voting opened the voting between October 4 and October 18. Id. In this election cycle, Florida's early voting began October 18 and runs until November 1. Fla. Stat. § 101.657(1)(b).
The early voting system, as implemented in Duval County, allows a registered voter to cast a vote at any of the demarcated early voting sites as opposed to having to cast the vote only at the assigned voting precinct on election day. As will be discussed below, voters' ability to vote at any of the early polling sites requires that the computers used at these sites be capable of accepting votes directed to any of the 285 voting precincts in Duval County. This type of programming is different than the programming required of election-day computers. Election-day computers must be programmed in such a way that the computers at each voting precinct are capable of accepting ballots from voters assigned only to that voting precinct. From the testimony delivered at the October 22 hearing (which will be commented on below), it seems that entirely different computer programs are required for use at early polling sites as opposed to at voting precinct sites on election day.
Turning back to the circumstances leading up to the filing of this case, the Supervisor of Elections Office in Duval County, based on section 101.657, announced that there would be one early voting site  the Supervisor of Elections Office in downtown Jacksonville. The Supervisor of Elections in Duval County only has one office, the main office, and has no branch offices. After learning that there was to be only one early voting site, members of the community, including individual Plaintiffs and representatives of Plaintiffs' organizations, began discussions with representatives of the Elections Office in hopes of convincing them to open more early voting sites. When such discussions were unsuccessful, many of these persons took the opportunity to speak to the City Council, especially at the City Council's meeting on October 13, 2004. Because lack of funding for the extra sites was raised as one of the reasons for not having the additional early voting sites, the City Council authorized the sum of $100,000 for partial funding of the four additional early voting sites at county libraries in Duval County. Thereafter, the Mayor of Jacksonville authorized the expenditure of $100,000 matching funds to provide all that was necessary to the opening of the four proposed sites. The proposed additional sites named were Bradham Brooks Northwest Regional Library, Regency Square Regional Library, *1330 Southeast Regional Library, and Willowbranch Library.
Nonetheless, Defendant Carlberg,[1] Assistant Supervisor of Elections, refused to open the suggested four additional early polling sites stating concerns over security, personnel, and infrastructure. During this same general time period, the Governor of Florida and Florida's Secretary of State both publically encouraged the Duval County Elections Office to open more early polling sites. Thereafter, on Wednesday, October 20, 2004, the newly appointed interim Supervisor of Elections. William Scheu, announced that four additional sites would be operational by Saturday, October 23, 2004.
Plaintiffs' Emergency Motion for Preliminary Injunction argues that "African Americans in Duval County have less opportunity than other members of the state's electorate to vote in the upcoming election." (Doc. No. 3, pg. 3.) Their claim is based on the fact that Duval County has the largest percentage of African-American registered voters of any major county in the state, and, yet, other similarly-sized counties with smaller African-American registered voter percentages have more early voting sites. Based on this, Plaintiffs argue that African-American voters in Duval County are disproportionally affected and, therefore, that the County's implementation of early voting procedures violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.
Plaintiffs also assert a claim pursuant to Title 42, United States Code, Section 1983 in that Defendants' actions constitute a violation of their rights under the Fourteenth and Fifteenth Amendments of the United States Constitution. Lastly, Plaintiffs claim that Defendant Hood has a duty to ensure that the state's election laws are applied uniformly throughout the state, and that this duty has been violated by Duval County's having fewer early polling sites than similarly-sized counties. Fla. Stat. § 97.012.
ANALYSIS
Before beginning the analysis necessary to determine the appropriateness of a preliminary injunction, the Court first takes this opportunity to acknowledge the important public service that has been undertaken by the Plaintiffs. At a time when many of the nation's men and women in uniform are engaged in establishing access to democratic elections for people outside the United States, it is imperative that we, as Americans, exercise our right to vote. In a democratic society, there can perhaps be no more laudable goal than that held by Plaintiffs: to encourage people to vote and to ensure access to the polls. The Supreme Court has acknowledged the preeminence of voting and has stated "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). It is with this understanding that the Court considers Plaintiffs' Motion.
Also as a preliminary matter, the Court expresses its sensitivity to the concerns expressed by Plaintiffs in regards to the comments made by Defendant Carlberg during their meetings with him. Reverend R.L. Gundy and Ms. Melanie Hopkins both testified that, when Defendant Carlberg was asked whether he would open the four additional polling places if required by a court order, Carlberg responded in the *1331 negative. The Court acknowledges that Defendants equally made clear that on occasion of Defendant Carlberg's comments, Ms. Cindy Laquidara, Jacksonville's Chief Deputy General Counsel, stated that the Elections Office would certainly comply with any order of the court. Nonetheless, the Court feels compelled to comment on Defendant Carlberg's statements.
It is clear to this Court, and it should be clear to Plaintiffs and Defendant Carlberg, that due to the contempt power of the courts, no lawfully issued order can merely be ignored by a party who disagrees with the order. While Defendant Carlberg may have believed that he would not comply with an order from this Court, such a course of action would merely be a vain attempt to avoid the inevitable as men and women before him have discovered. The Supreme Court made clear that even the President of the United States, regardless of being the Commander-in-Chief of the United States Armed Forces, can be equally subject to a court's order. United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Court orders have also had a profound impact on ensuring social change that may have been unattractive to people in power. For example. in 1958, the Supreme Court affirmed the duty of state officials to obey federal court orders implementing the Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). In Cooper, the Court ensured that Little Rock's desegregation plan would be carried out regardless of Arkansas Governor Orval Faubus' opposition. Similarly, Alabama Governor George Wallace's "blocking the schoolhouse door" in 1963 to stop the court ordered enrollment of two African Americans at the University of Alabama was ultimately ineffective. The Court recounts these historical events in order to ensure that all Parties are aware, that in the event this Court issues an order finding that federal or state law requires the opening of additional early polling sites and instructs the Supervisor of Elections to establish the sites, such an order would be complied with by all involved Parties.
Standard for Issuance of a Preliminary Injunction
In order to prevail in their request for a preliminary injunction, Plaintiffs must establish: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues: (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir.1998). The Eleventh Circuit Court of Appeals has explained that a preliminary injunction is an "extraordinary and drastic remedy" and should not be granted unless the movant clearly establishes the burden of persuasion as to the four requisites. Id.
Standing
Although not directly raised by the Defendants at the hearing, the Court expresses some concern over whether all Plaintiffs currently involved in the case have standing to pursue the claim. Under certain circumstances, an association or organization has standing to assert claims based on injuries to its members. The Supreme Court has recognized that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and; (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington *1332 State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). At this juncture, the Court need not address the standing of the associational Plaintiffs as there are two other named individual Plaintiffs. The Court merely raises the issue as it will be considered should the case proceed past the preliminary injunction phase.
Timeliness of Plaintiffs' Motion
Defendants initially argue against issuance of the preliminary injunction based on the late filing of Plaintiffs' Motion given the temporal proximity of the election. The Court acknowledges the difficulty that is created by the Motion being filed at this point in time given that early voting is almost half over. At the hearing, Ms. Hopkins, Plaintiffs' witness, acknowledged the fact that as early as late July/early August she was aware of the fact that there would be only one early voting site in Duval County and was further aware that other counties would utilize more sites. (Pl's Exhibit 4.) While Plaintiffs were aware of the situation by mid-August, Plaintiffs did not file suit earlier because they were engaged in the great American tradition of negotiating. As previously pointed out. Plaintiffs were first involved in discussions with state and local officials at the Supervisor of Elections office. Then, when it was determined that such discussions were fruitless, Plaintiffs turned to their politicians, including the City Council and Mayor, to request financial and public support for additional early voting sites. These attempts were made in hopes of reaching an amicable solution without engaging the judicial branch of government. The Court will not punish Plaintiffs for their decision to try other governmental channels before seeking judicial redress given that Plaintiffs filed suit in a timely fashion once other channels partial "came up dry."
At the Preliminary Injunction hearing, the Court pointed out its awareness that, because of the timing of Plaintiffs' Complaint, Plaintiffs' attorneys could not possibly prepare as well for the hearing as they could for a trial on the merits, which may or may not produce other evidence.
Justiciability
Courts are not adverse to becoming involved in the vindication of a citizen's right to vote. See e.g. Bush v. Vera, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (holding that the Texas redistricting plan used race as a predominant factor and was unconstitutional); Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (striking down New York statute limiting the right to vote in school elections to property owners); Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (striking down Virginia's poll tax); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (striking down Texas statute that denied non-Texan members of the armed forces stationed in Texas the right to vote in Texas); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (concluding that apportionment claims are not necessarily non-justiciable political questions).
This being said, it is clear that every regulation that creates an election structure will necessarily disenfranchise some voters.[2] It is equally clear that not *1333 every decision made by local, state, or federal officials in regards to voting creates a justiciable issue, or leads to a violation of the Constitution or federal or state election laws. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (articulating the relevant factors in determining whether an issue is a non-justiciable political question). While the Court will not address this issue at the current time, at a trial on the merits the Court would certainly consider the justiciability of the current issue.
Substantial Likelihood of Success on the Merits
As the Supreme Court has noted, "[t]he right of suffrage is a fundamental matter in a free and democratic society ... any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533, 561-62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).
Section 2 Claim
Section 2 of the Voting Rights Act states: "[n]o ... standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color." 42 U.S.C. § 1973(a). A violation of Section 2 occurs if, "based on the totality of circumstances [minority plaintiffs] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). To establish the existence of a "denial or abridgement" of the right to vote on account of race, the Eleventh Circuit Court of Appeals has held that:
[A] plaintiff must prove invidious discrimination in order to establish a violation of [S]ection 2 of the Voting Rights Act. Specifically, the plaintiff may prove either: (1) discriminatory intent on the part of legislators or other officials responsible for creating and maintaining the challenged system; or (2) objective factors that, under the totality of the circumstances, show the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme.
Osburn v. Cox, 369 F.3d 1283, 1289 (11th Cir.2004) (quoting Nipper v. Smith, 39 F.3d 1494, 1524 (11th Cir.1994)).
The above quote makes clear that no showing of discriminatory intent is required to prove a Section 2 violation. Id: see also Chisom v. Roemer, 501 U.S. 380, 384, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). Nonetheless, showing such an intent can establish a Section 2 violation. It is not completely clear whether Plaintiffs are proceeding solely on the second prong of the above test; therefore, in an abundance of caution, the court will briefly consider whether Plaintiffs have shown a substantial likelihood of success on a claim of discriminatory intent on the part of government officials.
Plaintiffs stress the findings of the Commission on Civil Rights that a disproportionate percentage of African-American voters were disenfranchised during the 2000 election. Plaintiffs perhaps want the Court to extrapolate from these findings a discriminatory intent, but such cannot be done. At the hearing. Plaintiffs discussed the Commission's finding that African-American voters in Duval County were over four times more likely than white voters to have their ballots rejected in the 2000 election. The Parties agree that the discounted votes in Duval County resulted from problems with the ballot. Unfortunately, as stated before, no one, the Commission included, was able to conclude what caused the ballot problems. *1334 Given this and without more evidence, it is impossible to find that the 2000 Duval County ballot problem was caused by a discriminatory intent on behalf of government officials. The Court notes the possibility that such evidence, if it exists, could be uncovered by Plaintiffs and presented to the Court at a trial on the merits, but that, because of the time crunch, Plaintiffs were unable to present such evidence to the Court. As this is the only evidence which seemingly tends toward the discriminatory prong of the Section 2 test, the Court now turns to the second prong and, as it must, engages in a "searching practical evaluation of the past and present reality." Thornburg v. Gingles, 478 U.S. 30, 37, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).
A summary of Plaintiffs' argument is necessary at this point. Duval County has the largest percentage of African-American registered voters of Florida's most densely populated counties. Yet, Duval County only has five early polling sites,[3] while similarly-sized counties with smaller percentages of African-American registered voters have more early voting sites. For example, Orange County, with 14 percent African-American registered voters, has nine early voting sites, as does Pinellas County, which has only 9 percent African-American registered voters. The Court understands Plaintiffs to argue that because the percentage of African-American registered voters is higher in Duval County than other counties in Florida, any decision to have a smaller number of early voting sites in Duval County. regardless of their placement. will have a disproportionate impact on African-American registered voters and results in a Section 2 violation.
Plaintiffs correctly point out that polling places constitute a "standard, practice, or procedure with respect to voting" under Section 2, and that placing voting sites in areas removed from African-American communities can have the effect of abridging the right to vote. Perkins v. Matthews, 400 U.S. 379, 387, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). But Plaintiffs are forced to concede that at least three of the four additional early polling sites have been placed in predominately African-American communities. In fact, in her Declaration, Ms. Hopkins stated that the four libraries "are located in African-American communities and therefore will alleviate the burdens that voters who reside in these communities would otherwise endure if they are forced to travel many miles downtown to participate in early voting." (Doc. No. 3, Exhibit A.)
Plaintiffs argue that there are African-American voters who live on the outskirts of the County, especially the eastern beach communities.[4] The evidence before the Court shows that the outlying areas of Duval County (those furthest from the established five early polling sites) are inhabited by predominately non-minority registered voters, that is non-African-American registered voters. Therefore, Plaintiffs are unable to show that the placement of the existing five sites has the effect of discriminating against African-American voters; nonetheless, it may be said that *1335 such placement cause inconvenience to those voters, African-American or otherwise, who live in the outlying areas of the County to the extent they must travel further to cast an early vote.
Plaintiffs also claim that having only five early polling sites results in long lines and difficulties at the sites, which in turn affect the ability of African-Americans, and others, to vote. However, the only evidence presented to the Court on this issue was testimony from Ms. Hopkins concerning her experience in early voting in the recent primary election. Ms. Hopkins testified that, on the last day of early voting in the primary election and after a 25 minute drive from the beaches area, she arrived at the Supervisor's Office (the only early voting site in the primary election) at approximately 9:30 a.m. (the office opened at 8:00 a.m.) and waited approximately twenty minutes to cast her vote, which she did. Ms. Hopkins further stated that she saw people leave the line before they voted. Ms. Hopkins could not provide testimony concerning whether those persons who left the line eventually cast a ballot. Plaintiffs could have testified only about the Elections Office site because at the time of the hearing none of the four additional sites had been opened. Additionally, no further testimony was given in regards to actual wait time or other problems experienced at that single early voting site during this current period of early voting. While it may be true that having to drive to an early voting site and having to wait in line may cause people to be inconvenienced,[5] inconvenience does not result in a denial of "meaningful access to the political process." Osburn, 369 F.3d at 1289. Nor does the Court have the authority to order the opening of additional sites based merely on the convenience of voters.
Additionally, on the evidence currently presented to the Court, it is impossible to say how the placement of early polling sites in the six counties, used as comparators by Plaintiffs. affect registered African-American voters in the respective counties. Plaintiffs did not provide information regarding the counties' placement of early polling sites, nor did they provide any statistical information on the racial breakdown of communities in close proximity to the sites or the length of time needed to travel to such sites from outlying areas. Therefore, the Court is not able to truly compare the seven counties as there is no way to tell whether some are apples and some are oranges. In essence, it could be the case that the nine sites in Orange and Pinellas Counties are in predominately non-minority communities, and that, based on the traffic patterns, most African-American voters would be required to travel many hours either by private or public transportation to reach the sites. The number of sites in different communities is almost meaningless without a deeper understanding of the contexts in which they exist. Given more time, it is possible that Plaintiffs could provide such information to the Court, but such did not occur at the expedited hearing.
The Court also notes that an acceptance of Plaintiffs' argument that a Section 2 violation occurs merely because some counties have more early polling sites would have far-reaching implications. Consider the fact that many states do not engage in any form of early voting. Following Plaintiffs' theory to its next logical step, it would seem that if a state with a *1336 higher percentage of registered African-American voters than Florida did not implement an early voting program a Section 2 violation would occur because African-American voters in that state would have less of an opportunity to vote than voters in Florida. It would also follow that a Section 2 violation could occur in Florida if a state with a lower percentage of African-American voters employed an early voting system, as commented on above, that lasts three weeks instead of the two week system currently used in Florida. This simply cannot be the standard for establishing a Section 2 violation.
The Court would be remiss if it did not briefly comment on the feasibility of Plaintiffs' requested relief. In Florida, early voting takes place up to and including November 1. Assuming the Court was to order the opening of four additional sites, it seems the County would need to order additional voting machines. Robert Phillips, Senior Elections Officer, testified that it is not feasible for additional early voting sites to use computers already in the County's possession because they are already programmed for the voting precinct in which they will be used. While it is possible to reprogram them. it is not practicable given that precinct poll workers have to be in receipt of the computers by Wednesday, October 27, which is now two days away. The computers cannot be in two places at the same time. Therefore, the County would have to order more. Even if they could receive them, 48 hours' public notice is required before testing the machines, which must be done before they can be used for voting. Thus, two days of the next seven days would have to be used for advertising, and the machines could not be used during that time. This explanation must also take into account issues surrounding whether there would be available manpower either at the County. State, or private business level to assist in setting up the sites, formatting the computers, and working the polls. In addition, it would take approximately two days to check out security and availability of space at the four proposed sites. As the election is only a week away, election resources are currently stretched to their limits. Upon consideration, the Court finds that while it may be technically possible to set up additional polling sites, it may not be practicable. Of course, the Court would certainly not order that the impossible be done.
Based on the foregoing, the Court is unable to say that Plaintiffs have at this time established a substantial likelihood of success on the merits. Therefore, the Court need not consider the remaining factors relevant to issuance of a preliminary injunction.
Section 1983 Claim
In order to establish a Section 1983 violation of the Fourteenth and Fifteenth Amendments, Plaintiffs must demonstrate both that Defendants deprived them of a right secured by the Constitution and that the deprivation occurred under color of state law. Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir.1998). Because it is not disputed that Defendants acted under color of state law, the Court need only address whether Defendants' actions violated the Constitution. The Eleventh Circuit Court of Appeals has explained that to establish a violation of the Equal Protection Clause of either the Fourteenth or Fifteenth Amendment, a plaintiff must show that a defendant's "decision or act had a discriminatory purpose and effect." Burton v. City of Belle Glade, 178 F.3d 1175 (11th Cir.1999); see also. Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 481, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997).
In light of the Court's conclusions as to Plaintiffs' claim under the Voting Rights Act, which requires a lower standard of proof, the Court need not separately address Plaintiffs' Section 1983 *1337 claim, which requires a higher proof of discriminatory purpose and effect.
State Law Claim
Florida Statutes, section 97.012(1) vests in the Secretary of State the responsibility to "maintain uniformity in the application, operation, and interpretation of the election laws." Considering that Plaintiffs are asking the Court to instruct a high-ranking state official on the carrying out of her statutory duties, there is currently insufficient evidence before the Court to find a substantial likelihood of success on this claim. Again, the Court notes that such a finding does not imply that, after engaging in discovery and investigation, Plaintiffs would still be unable to establish the claim. It merely means that, as discussed above, no definitive conclusions can be drawn from the current evidence concerning the other six counties and the remaining sixty counties.[6] Additionally, Plaintiffs failed to present evidence concerning early polling sites in Florida's remaining sixty counties. Such evidence would be necessary to support a finding that there exists a lack of uniformity in the "application, operation, and interpretation of the election laws." Fla. Stat. § 97.102(1).
CONCLUSION
Plaintiffs have failed to produce sufficient evidence to establish a substantial likelihood of success in terms of their claim of discrimination against or of denial of "meaningful access to the political process" on behalf of African-American registered voters. Plaintiffs have also failed to establish a substantial likelihood of success in terms of their Section 1983 and state law claims.
Of the four new polling places established in Duval County, three of them are in (or are in very close proximity to) predominately African-American communities, which have the highest concentration of African-American registered voters in the County. The original single voting site in the Supervisor of Elections Office, as mentioned previously, is also located in the center of an area with the highest concentration of African-American registered voters in the County. These additional four polling places were the sites suggested by the City Council after discussions with Plaintiffs and concerned members of the community. It was only after the announcement that these sites would be open, that Plaintiffs sought an order from this Court requiring the opening of four additional early polling sites in the far four corners of Duval County, away from the heavily concentrated African-American registered voter areas of the County. These new four additional sites would be placed in areas that have a predominately non-minority registered voter population. Therefore, while opening these sites might be more convenient to all voters in the outlying areas of Duval County, not opening them does not result in African-American voters being denied "meaningful access to the political process," nor does it result in a violation of the Constitution, the Voting Rights Act, or the Civil Rights Act of 1871 through discrimination against African-American voters. Not opening the four additional sites results in all voters who live in the far flung areas of Duval County having to travel further to cast an early ballot than most African-American registered voters who live closer to the city core and, therefore, closer to all the existing early voting sites.
While additional early voting sites for all voters, regardless of whom they might vote for, is a laudable goal, such a decision is not one for a federal court to order under the present circumstances. Instead, *1338 the power to do so under the Constitution and federal and state election laws under the facts in this case is left to the executive and legislative branches of both governments. Accordingly, because the remedy sought has no correlation to a race-based "meaningful access" case or to a race-based discrimination case, the Motion for Preliminary Injunction (Doc. No. 3) is DENIED.
NOTES
[1] It should be noted that the previous Supervisor of Elections, John Stafford, has been ill since early 2004 and only recently resigned from office, allowing Governor Bush to appoint an interim Supervisor. Until that resignation on Monday, October 18, 2004, Carlberg was acting for Supervisor Stafford in this matter.
[2] For example, the location of polling places makes its easier for voters who reside closer to that polling place to get there than those who live further away. Additionally, a decision in Florida to have two weeks of early voting makes it more difficult for Florida voters to vote early than those voters in a state that allows four weeks of early voting. If Duval County has more African-American voters than a similar county in another state that has four weeks of early voting, those Duval County voters are "disenfranchised" for two weeks.
[3] Again, the Court notes that at the time of Plaintiff's filing only one early voting site was open. However, as of Saturday, October 23 an additional four sites were to be opened, and, as far as the evidence before the Court, that opening has not changed. Thus, the Court will consider all five sites in rendering its decision.
[4] The remedy Plaintiffs seek is to have four additional early polling places established at the Beaches Regional Library, Highlands Regional Library, Mandarin Regional Library, and Webb Wesconnett Regional Library. These libraries are shown on Plaintiff's Exhibit 6, which is Exhibit B to William Scheu's Declaration (Doc. No. 9), and are numbered 3, 8, 9, and 19 respectively.
[5] The opening of the Regency Square Library appears from the maps admitted in evidence to cut the drive time from the beach communities in half, as does the opening of the Southeast Regional Library. And again, no one presented any evidence of the wait time at the only early voting location open at the time of the hearing.
[6] Florida currently has 67 counties, each having its own Supervisor of Elections.